2014 UT App 88
**SALT LAKE CITY, Plaintiff and Appellee,**

v.

**Thamer Jaber ALMANSOR, Defendant and Appellant.**

**No. 20121016–CA.**

Court of Appeals of Utah.

April 24, 2014.

Barton J. Warren, for Appellant.

Padma Veeru–Collings and Richard T. Jorgensen, for Appellee.

Judge STEPHEN L. ROTH authored this Memorandum Decision, in which Judges GREGORY K. ORME and J. FREDERIC VOROS JR. concurred.

Memorandum Decision

ROTH, Judge:

¶ 1 Thamer Jaber Almansor appeals his conviction for misdemeanor sexual battery on three grounds. First, he contends that the trial court committed plain error in failing to adequately question a potential juror, who later became the jury foreperson, during voir dire. Second, Almansor argues that the trial court either abused its discretion or committed plain error when it proceeded to trial despite a defense witness's failure to appear. Finally, he asserts that the jury's verdict was produced by undue pressure or coercion by the trial court. We affirm.

## I. Juror Voir Dire

¶ 2 Almansor contends that the trial court erred when it failed to adequately question Juror 10, who later became the jury foreperson, about any bias or a conflict of interest inherent in his employment. Almansor himself failed to ask the court to seek further information from this juror and so claims the court plainly erred in failing to do so on its own.

¶ 3 During voir dire, Juror 10 reported that he was an associate director at Salt Lake County Criminal Justice Services. In response to the trial court's question about whether any jurors had family members or close friends in law enforcement, Juror 10 explained that in his employment, he had "contact with prosecutors, defense attorneys, police officers, [and] county government related to criminal justice." In response to a followup question, however, he assured the court that nothing about his employment "would affect [his] ability to be impartial in this jury ... to any degree." Defense counsel did not request that the court ask any additional questions of this juror, nor did he ask that Juror 10 be removed from the panel for cause. As a consequence, Almansor has not preserved for review his claim about bias or conflict of interest. *See Turner v. University of Utah Hosps. & Clinics*, 2013 UT 52, ¶ 32, 310 P.3d 1212 (stating that a challenge based on juror bias is preserved so "long as (a) all of the party's peremptory challenges were used and (b) a juror who was previously challenged for cause ends up being seated on the jury");[1] *State v. King*, 2006 UT 3, ¶ 18, 131 P.3d 202 ("[O]bjections to the trial court's conduct during voir dire are not exempt from the preservation rule.").

¶ 4 Accordingly, we will only consider whether the court committed plain error in failing to question Juror 10 further. To prevail on a claim of plain error, an appellant must establish that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993).

¶ 5 The Utah Supreme Court has outlined the trial court's responsibilities when a prospective juror's response during voir dire raises a question of potential bias and trial counsel has neither objected for cause nor requested follow-up questioning. Recognizing that "[i]t is generally inappropriate for a trial court to interfere with counsel's conscious choices in the jury selection process," the supreme court has held that a trial court need not sua sponte remove the juror for cause or otherwise act to rebut the inference of bias *unless* "the juror has expressed a bias ... so strong or unequivocal as to inevitably taint the trial process." *King*, 2006 UT 3, ¶¶ 22–23, 131 P.3d 202 (omission in original) (citation and internal quotation marks omitted).

¶ 6 Almansor asserts that Juror 10's employment with Salt Lake County Criminal Justice Services on its face indicated a "strong or unequivocal" bias sufficient to have warranted further questioning or even removal by the trial court. Almansor at-

1. Although the City contends that Almansor has waived any claim regarding Juror 10's selection for the jury under the cure-or-waive rule, that rule has been replaced by the one adopted in *Turner v. University of Utah Hospitals & Clinics*, 2013 UT 52, ¶ 31, 310 P.3d 1212.

tempts to paint Juror 10 as biased in favor of the City because of his frequent interactions with law enforcement, prosecutors, and the court in his employment. Juror 10, however, informed the court that he also interacted frequently with defense attorneys, indicating that he was familiar with both sides in the criminal process. Furthermore, Juror 10's response did not indicate that he had any predisposition to favor or believe one side over the other. To the contrary, he stated that his professional associations would not "to any degree" affect his ability to remain neutral. Thus, we conclude that "[w]hile [Juror 10's] responses in this case have been sufficient to support a request by counsel for additional questioning," they were not "so strong or unequivocal as to inevitably taint the trial process." *See id.* ¶ 24 (citation and internal quotation marks omitted). Thus, the trial court's failure to further investigate Juror 10 sua sponte or remove him for cause did not amount to plain error.

## II. Defense Witness's Failure to Appear

¶ 7 Almansor next claims that the trial court either abused its discretion or committed plain error in proceeding to trial after Almansor informed the court that one of his witnesses had failed to appear. The City asserts that Almansor has waived this claim because he twice represented to the court his readiness to proceed to trial and he failed to request a continuance of trial.

¶ 8 On the morning of trial, Almansor and the City each represented to the trial court that they were ready to proceed to trial. Jury selection commenced, and it was not until after the jury had been impaneled and sworn that Almansor first informed the trial court that one of his witnesses had not arrived. The court adjourned for a twenty-minute recess so that Almansor could try to contact the witness. After he was unable to do so, the trial court said, "[W]e'll just go on with the trial, it is what it is, I mean, that happens." Almansor did not request a continuance or ask the court to take any steps to procure the witness (such as issuing a bench

warrant, for example); rather, he simply indicated his assent when the court then asked if the defense was ready to proceed.

◼ ¶ 9 Almansor's claim that the trial court abused its discretion in proceeding to trial fails for a number of reasons. First, Almansor has not demonstrated that the witness had in fact been subpoenaed for his trial, even though he describes her as "hostile" due to her friendship with the complaining witness. The only subpoena in the record required the witness's appearance at an earlier trial setting that had been continued, and Almansor has not pointed to any other place in the record that supports his contention that he subpoenaed the witness for this setting.[2] So Almansor has not shown that he subpoenaed the witness for trial. And if he did not, he cannot fault the court for his own failure to secure the witness's appearance. *See* Utah Code Ann. § 78B–1–129 (Lexis-Nexis 2012) (defining subpoena as the "process by which the attendance of a witness is required . . . at a particular time and place to testify"); *id.* § 78B–1–130 (outlining the subpoenaed witness's obligation to appear at the appointed time and place).

◼ ¶ 10 Second, and more importantly, even if Almansor did subpoena the witness, once he was aware that she had not appeared, he failed to request a continuance or otherwise ask the court to procure her appearance. Almansor asserts that such a motion would have been futile because the trial court had already indicated its intent to move forward with trial when the court said, "[W]e'll just go on with the trial, it is what it is . . ., that happens." The court, however, merely responded to Almansor's counsel's statement that he was "in a bit of a quandary" about what to do in the absence of his witness. Nothing about the court's statement foreclosed Almansor's opportunity (and responsibility) to request a continuance or to seek the court's assistance in procuring the witness, especially as Almansor had not yet made any such requests to which the court's

---

**2.** Almansor's counsel represented to the trial court that the witness had "been served a subpoena," but he did not address whether the witness had been subpoenaed for this trial setting or only for the earlier setting. Counsel's statement that he had last "spoken to her some time ago when this case was first set" does not resolve the question either way.

statement could be interpreted as a denial. When a party fails to make a motion to continue the proceedings under such circumstances, the issue is not preserved for appellate review. *See State v. Griffiths*, 752 P.2d 879, 884 (Utah 1988) (explaining that the defendant had not preserved a claim that trial ought to have been continued due to the nonappearance of one of his witnesses where the defendant made no such motion or objection to the trial court). Therefore, Almansor's claim on appeal fails unless he can demonstrate that the trial court plainly erred. *See State v. Weaver*, 2005 UT 49, ¶ 6, 122 P.3d 566.

¶ 11 Plain error, however, requires a showing of prejudice, *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993), and Almansor has not demonstrated that he suffered any harm from the trial court's decision to go forward with trial. Almansor's briefing focuses on the court's purported error in not procuring the witness to the exclusion of any analysis of the prejudice of that error. He does not address the anticipated content of the witness's testimony at all, nor does he demonstrate how her testimony would have helped the defense. He simply says the witness "was the best friend of the alleged victim, and [was] designated ... as a hostile witness" before remarking that the witness's "testimony could have possibly changed the verdict." This is insufficient to make the required showing of prejudice. *Cf. State v. Creviston*, 646 P.2d 750, 752 (Utah 1982) (affirming the denial of a motion for continuance on the basis that the defendant had failed to show that the excluded testimony was material and admissible when he had only claimed that the missing witness's testimony was " 'Vital' " and was expected to be in the defendant's behalf but did not provide any information about what the witness would say); *State v. Curtis*, 2013 UT App 287, ¶ 18, 317 P.3d 968 (explaining that to justify a remand under rule 23B of the Utah Rules of Appellate Procedure for the entry of more facts about trial counsel's decision not to call a particular witness, the defendant must allege nonspeculative facts regarding the contents of the uncalled witness's testimony). Almansor's witness claim therefore fails.

### III. Verdict Coercion

¶ 12 Finally, Almansor asserts that the jury's verdict was the product of undue pressure or coercion by the trial court. In particular, Almansor attempts to assign error to the court's method of responding to the jury's indication that it was split. We conclude that the court's response to the deadlocked jury was invited. But based on a review of the totality of the circumstances, including the court's instructions to and communications with the jury throughout the trial, we also determine that the verdict was not the result of trial court pressure or coercion.

¶ 13 Shortly after the jury was impaneled and prior to the presentation of any evidence, the trial court instructed that "[i]t is the responsibility of the jury ... to reach a verdict based upon the evidence" and in accordance with the instructions that would later be given. Following the presentation of evidence, the court instructed the jury on the applicable law and the process it should follow in reaching a decision. Instruction 18, in particular, gave the jurors detailed advice on how they should deliberate:

When you go into the jury room to deliberate, discuss the evidence and speak your mind with each other. Open discussion *should help you reach a unanimous agreement on a verdict.* Listen carefully and respectfully to each other's views and keep an open mind about what others have to say.

I recommend that you do not commit yourselves to a particular verdict before discussing all of the evidence. *Try to reach unanimous agreement, but only if you can do so honestly and in good conscience.* If there is a difference of opinion about the evidence or the verdict, do not hesitate to change your mind if you become convinced that your position is wrong. On the other hand, *do not give up your honestly-held views about the evidence simply to agree on a verdict, to give in to pressure from other jurors or to just get the case over with.* In the end, your vote must be your own.

*Because this is a criminal case, every single juror must agree with the verdict before the defendant can be found guilty or not guilty.* In reaching your verdict, you may not use methods of chance, such as drawing straws or flipping a coin; rather, the verdict must reflect your individual, careful and conscientious judgment as to whether the evidence presented by the prosecutor proved each charge beyond a reasonable doubt.

(Emphasis added.)

¶ 14 Approximately two-and-a-half hours after the jury was excused to deliberate, the trial court notified the parties that "we have a pretty deadlocked jury." The court explained that "an hour-and-a-half ago"—an hour after deliberations began—the jurors "wrote a note" to the court saying "they were split." At that time, the court "told them simply to continue to deliberate." The court asked the parties to return to the courtroom because the court was "a little pessimistic about [the jury's] ability to reach a verdict" and it wanted direction from counsel on whether it should "give an *Allen* instruction"[3] or declare "a mistrial." When the parties returned to the courtroom, the court told counsel that the bailiff had inquired about the status of deliberations twenty minutes earlier and the jury still "appear[ed] to be deadlocked." The court then asked counsel whether it should "do an *Allen* instruction, send [the jury] back for further deliberations or ... try to get a sense and poll the jury relative to whether they believe there's any way that ... they would be able to reach a verdict." Almansor's counsel stated that he would "[d]efer to the wisdom of the Court, whatever your thoughts are." After the City indicated that an *Allen* instruction was unlikely to move the jury, the court decided to poll the jurors. Almansor's counsel concurred with that decision, stating, "That's fine, Judge."

¶ 15 The court brought in the jurors and informed them that it was aware that they had not yet been able to reach a verdict. The judge then asked the foreperson: "Do you believe there's a possibility, if you were to go back and continue deliberating, that you would be able to reach a verdict?" The foreperson responded, "I think ... if we had ten minutes, I would know the answer to that." After confirming that the parties had no objection to sending the jury back to answer that question, the jury was excused on the foreperson's representation to the court that the jurors would discuss whether they "would be able to become unanimous or not." About twenty minutes later, the jury returned with the guilty verdict.

¶ 16 Almansor argues that the jury was coerced or pressured to reach a verdict by the trial court's emphasis on unanimity in its instructions and its direction that the jury continue deliberating after it had indicated that it was deadlocked. He asserts that the shift from deadlock to verdict in twenty minutes is evidence of that coercion. Almansor also claims that the court's decision to poll the jury and its subsequent exchange with the foreperson may have caused the jury to feel as though it had to reach a verdict within ten minutes. The City responds that Almansor essentially invited any error the trial court may have made by stating, in essence, that he would defer to the court's judgment on how to handle the deadlock issue and then voicing no objection to how the court proceeded. But even in the absence of any invitation by Almansor, the City maintains, all of the jury instructions correctly stated the law and because the jury received no further instruction on *how* to reach a verdict after it indicated its split, but instead was only asked *if it could* reach a verdict, the court did not coerce or pressure the jury. We conclude, based on Almansor's response to the court's questioning about how to address the jury's apparent divide and his si-

3. "An *Allen* charge is a supplemental instruction ... designed to encourage a divided jury to agree on a verdict." *Hooks v. Workman*, 606 F.3d 715, 719 n. 1 (10th Cir.2010) (omission in original) (citation and internal quotation marks omitted). Utah has approved the use of a modified *Allen* instruction that does not overemphasize unanim-

ity or suggest that the court is demanding a verdict. *State v. Harry*, 2008 UT App 224, ¶¶ 6, 9, 189 P.3d 98; *see also State v. Dalton*, 2014 UT App 68, ¶ 47 ("[T]he non-coercive use of *Allen* charges is permitted in Utah...." (alteration in original) (citation and internal quotation marks omitted)).

lence in response to the court's subsequent actions, that Almansor invited the court's handling of the issue.

¶17 "[A] party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." *State v. Geukgeuzian*, 2004 UT 16, ¶9, 86 P.3d 742 (citation and internal quotation marks omitted). A party invites an error in instructing the jury when "counsel either by statement or act, affirmatively represented to the court that he or she had no objection." *Id.* Here, in response to the jury's announcement that it was split on a verdict, the trial court offered four possible responses—give an *Allen* instruction, allow the jurors to continue deliberating without further instruction, poll the jurors, or declare a mistrial—and then asked counsel for their input on how best to address the situation. Almansor's attorney declined to give an opinion, instead electing to "[d]efer to the wisdom of the Court, whatever your thoughts are." When the court then decided to poll the jury, counsel concurred in that judgment, stating, "That's fine, Judge." Counsel further indicated agreement with the court's response when he stated "[n]o objection" to the court's decision to send the jury back after the foreperson indicated that he could let the court know if the jury could reach a verdict with ten more minutes of discussion. Because Almansor led the trial court to believe that its response to the deadlock was appropriate, we cannot assign the response as error. *See id.*

¶18 Moreover, we are convinced that the court's instructions to and interactions with the jury, as a whole, do not support a conclusion that the court coerced the verdict. Thus, under the totality of the circumstances, defense counsel's expression of confidence in the trial court's exercise of its judgment on how to handle the jury deadlock proved to have been warranted.

¶19 The trial court's jury instructions, particularly Instruction 18, had already properly informed the jury of its role as the finder of fact regarding Almansor's guilt or innocence and of the requirement for a unanimous verdict to either convict Almansor or acquit him. Instruction 18 did not overemphasize una-

nimity or instruct the jury to reach a verdict at any cost; rather, it told the jurors to "[t]ry to reach unanimous agreement" but only if each of them "can do so honestly and in good conscience." And while each juror was encouraged to "speak your mind" in the process of deliberation, the jurors were also advised to "[l]isten carefully and respectfully to each other's views." In particular, they were cautioned not to "give up ... honestly-held views about the evidence simply to agree on a verdict" or "to give in to pressure from other jurors ... to just get the case over with."

¶20 Then, once the jury reported that it was divided, the trial court made no effort to force a decision. Although the court directed the jury to keep deliberating after first being advised that there was a split, that direction came after the jury had been working for just one hour and was not accompanied by any further instruction or any implication that the jury must reach a verdict. When the jury still had not reached a consensus after another hour-and-a-half had passed, the court decided to call counsel back to seek input on how to respond. At that point, the court indicated its concern that it did not want the response "to be coercive." After giving the attorneys an opportunity to weigh in, the court elected to poll the jurors. This occurred approximately three hours after the jury had been excused to deliberate. During the polling process, the court did not ask for a breakdown of the split nor did it ask any of the jurors to change his or her position or otherwise imply that any of the jurors should do so. Furthermore, the court did not explicitly communicate an intent to keep the jury until it reached a verdict; indeed, its questions about the likelihood of reaching a unanimous verdict could be viewed as indicating the court's willingness to release the jury if it could not reach a consensus. And it was only upon the foreperson's representation that the jurors needed a few minutes to discuss whether a verdict was possible that the jury was sent back to the jury room. Before excusing them, however, the court clarified that the purpose was to "resolve whether [they] would be able to become unanimous or not." Although the fact that

the jury came to a verdict only twenty minutes after it returned to the jury room could support an inference that some pressure was at work, that alone is insufficient to taint the verdict where the circumstances as a whole lead to a conclusion that it was not the product of coercion.

¶ 21 Finally, neither the trial court's instructions prior to deliberations nor its response to the jury's announcement that it was split create the type of circumstances that have been deemed coercive. *See, e.g., State v. Ginter,* 2013 UT App 92, ¶¶ 8–9, 300 P.3d 1278 (explaining that the verdict is more likely to be the product of coercion when the trial court singles out a known minority of jurors standing for a particular result and asks them to change their minds; where the *Allen* instruction emphasizes the cost, time, and inconvenience of a new trial to the point that the jury may feel that it must reach a verdict; and where the jury returns a verdict within a very short time after the *Allen* instruction); *cf. State v. Clements,* 967 P.2d 957, 959 (Utah Ct.App.1998) (stating, in the context of a jury not yet deadlocked, that a trial court's request for the jurors to "come to some consensus from among the options of (1) returning [to deliberate] . . . , (2) letting the court know they were deadlocked, or (3) reaching a verdict" was not coercive, even though the jury reached a verdict within a few minutes of the court's request).

¶ 22 And the cases upon which Almansor relies to support his position that there was coercion are inapposite. First of all, those cases involve the giving of an *Allen* instruction. More importantly, they all identify several indicators of coercion that are not present here. *See, e.g., State v. Harry,* 2008 UT App 224, ¶¶ 9, 16, 21, 34, 189 P.3d 98 (concluding that the verdict had been coerced when the jury found the defendant guilty within thirty minutes of receiving a modified *Allen* instruction because that instruction was aimed at the single dissenting juror, overemphasized unanimity, and unduly emphasized the cost, time, and inconvenience of a new trial); *Hooks v. Workman,* 606 F.3d 715, 741–42, 747–751 (10th Cir.2010) (concluding that a verdict to impose the death penalty was coerced where the initial instruc-

tions "focused narrowly on the concept of unanimity"; the *Allen* instruction, which was given within minutes of the court learning that there was a single holdout juror, not only failed to inform the jury that unanimity was not required but also failed to correct the jury's misunderstanding that the decision had to be unanimous to impose punishment; and the court's subsequent actions aimed at preparing for jury sequestration overnight indicated to the jurors that deliberations would continue until they reached a unanimous verdict).

¶ 23 In contrast to those cases, the trial court here gave no *Allen* instruction. And the initial instructions cautioned the jurors to decide the case only if they could "do so honestly and in good conscience" and without "giv[ing] up . . . honestly-held views about the evidence simply to agree on a verdict, to give in to pressure from other jurors or to just get the case over with." Furthermore, the last exchange the jury heard before it retired to deliberate for the last time implied that deliberations would cease if the jury decided it could not reach a verdict. Therefore, the totality of the interactions between the court and the jury "conveyed the idea that the jury did not have an absolute duty to reach a verdict." *See State v. Dalton,* 2014 UT App 68, ¶ 51, —— P.3d —— (concluding that an *Allen* instruction that contained similar instructions was not coercive).

¶ 24 As a final matter, we note that in considering the options for responding to the jury deadlock, the trial court stated, "I don't want there to be any coercion on any part with regard to pressure by jurors and my sense is that there may be a belief that that's going on." Although the wording suggests that the court may have been concerned about the possibility that there was pressure among the jurors themselves, neither party followed up on the court's comments or expressed any concerns about coercion inside the jury room. Furthermore, nothing in the record, aside from this statement, suggests pressure on the jurors. Almansor now asserts on appeal that "[t]he judge was aware that coercive tactics were being used amongst the jurors, one of whom was well-versed in criminal law and procedures," but

he does so in the context of his argument that it was coercive to require the jury to continue deliberating after it indicated that it was divided and without further instruction that the jury need not reach a verdict. Thus, Almansor seems to be using the court's statement as further weight for his claim that the verdict was coerced.

¶ 25 In the absence of any objections or concerns raised by counsel regarding pressure or coercive tactics amongst the jury members, our focus on appeal must remain on the trial court's interactions with the jury. *See generally Jessop v. Hardman*, 2014 UT App 28, ¶ 25, 319 P.3d 790 ("Rule 606(b)(1) of the Utah Rules of Evidence prohibits virtually all inquiries into the jury deliberation process . . .: During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." (citations and internal quotation marks omitted)). As we discussed above, the trial court did not exert any pressure or coercion on the jury to reach a verdict. Indeed, the court seemed acutely aware of the potential for actual or perceived coercion and exercised significant caution in responding to the jury's concerns about reaching agreement. In this context, we view the court's statement that there may be a "belief that [coercion is] going on" as simply an explanation for the court's caution.

¶ 26 In summary, we conclude that Almansor invited the trial court to poll the jury and did not object to the court's decision to send the jury back to determine if it could reach a verdict. In any event, nothing in the trial court's interactions with the jury after the jury indicated that it was split evidences any undue pressure or coercion of the jury by the court.

¶ 27 For the foregoing reasons, we affirm Almansor's conviction.