**2015 UT App 167**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
EUGENE FLETCHER,
Defendant and Appellant.

Memorandum Decision
No. 20130124-CA
Filed July 2, 2015

First District Court, Logan Department
The Honorable Thomas Willmore
Nos. 121100882 & 111101367

David M. Perry, Attorney for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Memorandum Decision, in
which JUDGES JAMES Z. DAVIS and KATE A. TOOMEY concurred.

ROTH, Judge:

¶1    Eugene Fletcher appeals his convictions on two counts of
distributing marijuana in a drug-free zone, a second degree
felony. We affirm.

¶2    Fletcher sold marijuana twice to a confidential informant
(the CI) working for the Cache-Rich Drug Task Force.[1] The first
buy took place in a grocery store parking lot. The task-force
agent (the Detective) who led both of the buys picked up the CI

---

1. "We view the facts in the light most favorable to the jury
verdict and recite them accordingly." *State v. Loose*, 2000 UT 11,
¶ 2, 994 P.2d 1237.

and drove him to the back of a church parking lot near the grocery store. The CI was searched for weapons, drugs, and money and then given $50 cash and a radio transmitter. The CI then waited in front of the grocery store. The Detective and two other agents were parked in different locations in the grocery store parking lot.

¶3 Fletcher drove into the parking lot and told the CI to "jump in" his car. Fletcher gave the CI three bags of marijuana in exchange for $50. The agents were able to listen to the transaction through the radio transmitter and see Fletcher's vehicle from their vantage points in the parking lot. When the CI exited the vehicle and went inside the grocery store, the agents lost sight of him for about fifteen to twenty seconds. An agent immediately followed the CI into the store and "told him to get out of the store and go meet with [the Detective]." The CI did so and handed the Detective the three bags of marijuana he had just purchased from Fletcher. No other items were found during a search of the CI.

¶4 Nine days later, another controlled buy was arranged to take place in the same parking lot. Once again, the CI was searched, provided with a transmitter radio, and given cash to purchase marijuana, this time $40. At the parking lot, the CI received a phone call from Fletcher to "keep walking" and meet him at a nearby laundromat instead of the grocery store parking lot. The CI did as instructed, and he and Fletcher entered the laundromat together. In the meantime, the Detective and another agent, who had heard the phone call through the radio, repositioned their own vehicles. The Detective parked where he could watch the CI walk toward the laundromat, and the agent parked directly in front of the business so he could see into the building. Inside the laundromat, Fletcher gave the CI two plastic bags of marijuana in exchange for the $40. The CI left the building and by radio arranged with the agents to let him walk a short way down the road before picking him up to avoid

arousing Fletcher's suspicions. The Detective then met the CI, who passed over the marijuana he had just purchased from Fletcher. As before, an agent searched the CI for contraband after the buy and found none.

¶5     Fletcher was charged with two counts of distributing marijuana in a drug-free zone. During voir dire, one of the jurors (the Juror) indicated she had a family member who had been arrested for a similar crime. She said her son had been arrested by one of the agents who was testifying in the present case and that she knew two attorneys in the Cache County Attorney's Office, though neither attorney was participating in the trial. In chambers, the Juror further explained that her son had been arrested as a minor for drug possession a couple of years before and had gone on to work as a confidential informant. The Juror also stated that she had served as a scoutmaster a number of years before for one of the two attorneys she knew in the Cache County Attorney's Office. She was questioned by the trial court and counsel, and the trial court determined that the Juror could be impartial and fair. The court denied Fletcher's motion to strike her for cause. At trial, the Detective, as well as five other agents involved in the case, testified about the two buys. The jury convicted Fletcher of both counts.

¶6     Fletcher appeals, raising three issues for our consideration. First, Fletcher argues that the Detective's testimony was so "inherently improbable" as to render the evidence presented by the State insufficient to sustain the jury's verdict. Second, Fletcher contends the trial court admitted the Detective's testimony in violation of rule 602 of the Utah Rules of Evidence. Finally, Fletcher argues the trial court abused its discretion in allowing the Juror to be seated.

¶7     Fletcher first argues the evidence was insufficient to support the jury's verdict. We will reverse a jury verdict on the basis of insufficient evidence "only when the evidence is

sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *State v. Rowley*, 2008 UT App 233, ¶ 8, 189 P.3d 109 (citation and internal quotation marks omitted). Fletcher contends that the Detective's testimony was so "inherently improbable and incredibly dubious" as to meet this standard. We disagree.

¶8 Fletcher points to inconsistencies in the Detective's testimony that he contends make the Detective's testimony so "inconclusive or inherently improbable" as to create a "reasonable doubt" that he "committed the crime[] of which he was convicted." *See id.* For example, Fletcher compares testimony given by the Detective at two preliminary hearings. At one preliminary hearing the Detective testified that the CI had likely come to the police station to prepare for the controlled buys, but at another preliminary hearing the Detective testified that he was not sure if the CI had come to the police station prior to the buys. Fletcher also points to inconsistent testimony offered by the Detective at trial about whether he or another agent conducted the initial search of the CI at one of the controlled buys. The Detective's field notes also contradicted the amount listed in the police report regarding the amount of money given to the CI at one of the buys, and the CI's testimony regarding the Detective's location during the second buy was different from the Detective's own description of where he was at the time. We are not persuaded that inconsistencies of this sort are significant enough to demonstrate that the Detective's testimony was "sufficiently inconclusive or inherently improbable" to make him unbelievable as a matter of law. *See id.* (citation and internal quotation marks omitted).

¶9 Our supreme court has held "that the definition of inherently improbable must include circumstances where a witness's testimony is incredibly dubious and, as such, apparently false." *State v. Robbins*, 2009 UT 23, ¶ 18, 210 P.3d 288.

To reach that standard, there must be (1) "material inconsistencies in the testimony" and (2) "no other circumstantial or direct evidence of the defendant's guilt." *Id.* ¶ 19. Otherwise, "[t]he existence of any additional evidence supporting the verdict prevents the judge from reconsidering the witness's credibility." *Id.; see also State v. Kamrowski*, 2015 UT App 75, ¶ 16, 347 P.3d 861; *State v. Lomu*, 2014 UT App 41, ¶ 14, 321 P.3d 243. Here, none of the inconsistencies are material. Whether the CI was given $50 or $120 to exchange for the marijuana, whether the Detective or another agent conducted the search of the CI, and on which side of the laundromat the Detective was parked were not material parts of the Detective's testimony but rather were merely details supporting his primary assertion that he observed Fletcher selling marijuana on two different occasions. Such minor inconsistencies did not rise to the level that would render his testimony "apparently false," *see Robbins*, 2009 UT 23, ¶ 18, but instead are within the range of normal, but flawed, human recollection—something that juries are capable of sorting through.

¶10   And there was certainly "other circumstantial or direct evidence" of Fletcher's guilt of the two counts of distribution in a drug-free zone for which Fletcher was convicted. *See id.* ¶ 19. The CI testified that he purchased marijuana from Fletcher twice in February 2011. Five other task-force agents who monitored the two buys and the CI all testified, corroborating the Detective's story. Evidence was also presented that the distance from the grocery store where the first buy took place to a nearby church was 347 feet and the distance from the laundromat where the second buy took place to the church was 610 feet, well within the 1,000 feet required to establish a drug-free zone under the statute. We therefore conclude "additional evidence supporting the verdict" exists and the trial court did not have a basis for rejecting the Detective's testimony as incredible. *See id.* Accordingly, Fletcher's claim of insufficiency of the evidence,

based on his contention that the Detective's testimony was inconclusive or inherently improbable, fails.

¶11     Fletcher next contends that the Detective's testimony was not based on his personal knowledge and therefore was "incompetent" under rule 602 of the Utah Rules of Evidence. Rule 602 states, in part, that "[a] witness may testify only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Utah R. Evid. 602. When asked about the reason for the discrepancies between his trial testimony and preliminary hearing testimony, the Detective stated that before the preliminary hearing, he "hadn't talked to the other agents that were assisting and, once you start doing that, you start jogging your memory." Fletcher argues that this statement by the Detective revealed that the Detective "did not have personal knowledge regarding the subject matter of his testimony both at the preliminary hearings and trial, and testified that colluding before trial was a common practice among drug task force agents." He therefore argues that the Detective's testimony violated rule 602 and should not have been admitted.

¶12     Because his counsel raised no such objection at trial, Fletcher claims that the trial court committed plain error in allowing the Detective to testify. *See State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346 (listing plain error as an exception to preservation rule). Plain error requires a defendant to show that "(i) an error exists; (ii) [it] should have been obvious to the trial court; and (iii) [it] is harmful." *State v. Lee*, 2006 UT 5, ¶ 26, 128 P.3d 1179 (citation and internal quotation marks omitted). We agree with the State that no error occurred here.

¶13     In *State v. Eldredge*, 773 P.2d 29 (Utah 1989), our supreme court determined that rule 602 "merely requires that the witness have the opportunity and the capacity to perceive the events in question." *Id.* at 33. Here, as in *Eldredge*, "there is no contention

that [the Detective] lacked personal knowledge" of the relevant incidents. *See id.* The Detective was the lead investigator on both buys, was present at both buys, and monitored each of the controlled buys via radio transmitter. Thus, he clearly had the "opportunity and the capacity to perceive the events in question." *See id.* And while the Detective did say that he "jogg[ed]" his memory by talking to other task-force agents prior to trial, that statement does not establish that his conversations with other agents replaced his own recollections of events or filled in the blanks of irretrievably lost memory. Rather, a common meaning of "jog" in this context is "to stir or jolt into activity or alertness, as by a hint or reminder: to jog a person's memory." *Jog*, Dictionary.com, http://dictionary.reference.com/browse/jog (last visited June 18, 2015). And Fletcher has identified nothing in the record that suggests the Detective's conversations with other task force agents did anything more than refresh the Detective's own memory. Accordingly, Fletcher has not persuaded us that the Detective's testimony violated rule 602.

¶14 Finally, Fletcher contends that the trial court erred in seating the Juror over his objection, "given her relationships with [one of the agents], two deputy county attorneys, and her son's previous involvement as a confidential informant." "A motion to dismiss a prospective juror for cause is within the sound discretion of the trial court. When reviewing such a ruling, we reverse only if the trial court has abused its discretion." *State v. Cox*, 826 P.2d 656, 659 (Utah Ct. App. 1992) (citation and internal quotation marks omitted). "Under this standard, we will not reverse the trial court's ruling unless we find that ruling was beyond reason." *State v. Calliham*, 2002 UT 86, ¶ 47, 55 P.3d 573.

¶15 Rule 18 of the Utah Rules of Criminal Procedure provides that "[a] challenge for cause is an objection to a particular juror and shall be heard and determined by the court." Utah R. Crim.

P. 18(e). Under this rule, jurors may be excluded for, among other things,

> (e)(4) The existence of any social, legal, business, fiduciary or other relationship between the prospective juror and any party, witness or person alleged to have been victimized or injured by the defendant, which relationship when viewed objectively, would suggest to reasonable minds that the prospective juror would be unable or unwilling to return a verdict which would be free of favoritism. . . .
>
> . . . .
>
> (e)(14) Conduct, responses, state of mind or other circumstances that reasonably lead the court to conclude the juror is not likely to act impartially.

*Id.* "Once a juror's impartiality has been put in doubt, a trial judge must investigate by further questions to determine if the juror has merely 'light impressions' or impressions which are 'strong and deep' and which will affect the juror's impartiality." *State v. Woolley*, 810 P.2d 440, 443 (Utah Ct. App. 1991), *overruled on other grounds as recognized by State v. Robertson*, 2005 UT App 419, 122 P.3d 895. "In our review, we look to the entire voir dire exchange with the challenged juror." *Calliham*, 2002 UT 86, ¶ 47 (citation and internal quotation marks omitted).

¶16 The Juror was questioned at length about her son's criminal history and involvement with law enforcement. The Juror stated that a few years earlier her son had been arrested more than once for drug possession. She also stated that some of his charges were dismissed in return for working as a confidential informant and "giv[ing] some names." She explained that her son was now "doing really well" and that the

experience had been "painful" for her family but was "good . . . for him" because "it turned him around."

> [Defense Counsel]: Do you think that was a good way to go to give information to get your case dismissed? Do you have an opinion on that?
>
> [The Juror]: You know, I don't know, because he had some charges later. So—
>
> [Defense Counsel]: It didn't help him?
>
> [The Juror]: Yeah. I mean, at that time, he probably, would have been in some very, very serious trouble.
>
> [Defense Counsel]: Were there felony charges, then?
>
> [The Juror]: They, probably, would have been at that time.
>
> [Defense Counsel]: Was your son dealing drugs?
>
> [The Juror]: No. He wasn't dealing drugs, but he was involved with some people that were, but his was mostly using and had some in his possession and stuff. So—
>
> [The Court]: Has there been any ramifications as the result of him giving information to—
>
> [The Juror]: No. It was all confidential.

The State did not question the Juror about her son's involvement as a confidential informant.

¶17    The Juror was also questioned about her associations with two prosecutors in the Cache County Attorney's Office, who were not part of Fletcher's case, as well as one of the testifying agents. The Juror had come in contact with all three because of her son's prior criminal history but also knew one of the prosecutors because she had served as his scoutmaster for a time when he was a boy and had attended church with him. Defense counsel specifically questioned the Juror about her interactions with the testifying agent.

> [Defense Counsel]: So, [the testifying agent] was involved in the arrest of your son?
>
> [The Juror]: He was actually arrested more than one time.
>
> . . . .
>
> [Defense Counsel]: How did [the testifying agent] treat you during the whole process?
>
> [The Juror]: He was very cordial and very professional.

The prosecutor then followed up on the Juror's relationship with the two prosecutors and asked "With your contact with them and this case, do you have any hard feelings against them or things that would make you—" to which the Juror replied, "No."

¶18    When asked by the trial court if she would be "able, in light of what happened there, to fairly hear both sides and make a decision," the Juror answered, "Yes." Fletcher's counsel requested that the Juror be removed for cause because she had been a scoutmaster to a prosecutor in the Cache County Attorney's Office and because "[h]er son gave confidential information to police to get rid of his charges and that's what [the CI] did here. I think she would probably have some bias

towards that." The trial court responded, "You know . . . she indicated that she could fairly . . . hear things. I asked her if there had been any ramifications or problems with regards to that. So, I'm not going to strike her."

¶19 Fletcher contends this ruling was an abuse of discretion and that the Juror's relationships and prior experiences with members of the prosecutor's office and law enforcement should have disqualified her as a juror. We are not persuaded that the trial court exceeded its discretion in declining to strike the Juror.[2]

¶20 The Juror's relationship with one of the prosecutors appeared to be no more than that of an acquaintance. *See Butterfield v. Sevier Valley Hosp.*, 2010 UT App 357, ¶ 32, 246 P.3d 120 ("Jurors are not biased merely because they are acquainted with a party or witness."). And her role as a former scoutmaster for another prosecutor years prior is not the type of relationship that has warranted exclusion from jury service in the past. For example, in *State v. Cobb*, 774 P.2d 1123 (Utah 1989), the Utah Supreme Court determined that a trial court had not abused its discretion in refusing to dismiss a juror because she had been friends with and attended church with the prosecutor's family and because she remembered the prosecutor as a "nice kid." *Id.* at 1126 (internal quotation marks omitted). There the supreme court stated,

> Review of [the juror's] answers to counsel's
> questions reveals that her brief acquaintance with
> the prosecutor was not the type of relationship that

---

2. We think it is worth repeating here, however, our supreme court's observation "that it is a simple matter to obviate any problem of bias simply by excusing the prospective juror and selecting another." *State v. Wach*, 2001 UT 35, ¶ 25, 24 P.3d 948 (citation and internal quotation marks omitted).

would warrant an inference of bias, especially in light of a later statement where she expressed no doubts about her ability to decide the case impartially regardless of any attenuated acquaintance with the prosecutor.

*Id.* We come to a similar conclusion here, particularly where neither of the prosecutors the Juror was acquainted with were involved in Fletcher's trial.

¶21 Fletcher argues, however, that the Juror's relationship with the prosecutors was more significant when viewed in light of her acquaintance with one of the testifying agents and her son's previous position as a confidential informant. This is a closer question, but after reviewing the voir dire as a whole, we are not persuaded the trial court exceeded its discretion in permitting the Juror to be seated. *See State v. Calliham*, 2002 UT 86, ¶ 47, 55 P.3d 573. "Only 'strong and deep impressions' on the part of a venireman . . . serve as a basis for disqualification for cause. The question of degree of partiality (or 'impressions') remains largely in the discretion of the trial court." *State v. Lacey*, 665 P.2d 1311, 1312 (Utah 1983) (per curiam) (footnote omitted), *overruled on other grounds as recognized by State v. Robertson*, 2005 UT App 419, 122 P.3d 895. "[B]ased on the juror's expressed feelings, attitudes, and opinions, the trial court must determine by a process of logic and reason, based on common experience, whether the juror can stand in [an] attitude of indifference between the state and the accused." *Id.* (citation and internal quotation marks omitted). While the Juror did state that the testifying agent had treated her professionally and cordially when interacting with her regarding her son's arrest—a statement Fletcher asserts shows her bias toward the prosecution—in the context of the rest of the questioning, her statement can be seen as merely allaying any concerns that she had hard feelings against the testifying agent for arresting her son that would prejudice her against the prosecution. And no

information was elicited that her interactions with the testifying agent had been so numerous or significant as to create "strong and deep" rather than lighter impressions. *See id.* (internal quotation marks omitted).

¶22    Fletcher contends that the Juror's son's experience as a confidential informant and her positive experience with law enforcement "left her with greater potential sympathy toward law enforcement and confidential informants than in a juror without similar connections and background." In *State v. Bailey*, 605 P.2d 765 (Utah 1980), *overruled on other grounds as recognized by West v. Holley*, 2004 UT, 103 P.3d 708, our supreme court determined that a trial court had erred in failing to dismiss two jurors who had shown bias in favor of law enforcement. *Id.* at 767–68. When the jury pool was asked "Are there any of you who believe you would be inclined to give the testimony of a Peace Officer greater weight than you would the testimony of someone who was not a Peace Officer?" one of them answered, "I think I probably would." *Id.* at 767 (internal quotation marks omitted). And then when another juror stated "a Peace Officer is generally a very reliable observer. They are trained to be as such and they are not likely to jump to hasty conclusions," the first juror concurred in that statement. *Id.* at 768 (internal quotation marks omitted). Another potential juror told the trial court that "you can rely upon [a peace officer's] testimony and their background to the utmost . . . I would want to stand behind them a hundred percent." *Id.* (omission in original) (internal quotation marks omitted).

¶23    Here, the Juror stated that a law enforcement officer had treated her professionally and respectfully and that her son's experience had been "good . . . for him." While the Juror's prior experiences raise a question of bias, we are not persuaded that the trial court's determination that the Juror's statements did not rise to a level that demonstrated actual bias was an abuse of its discretion. "When an inference of bias is raised, the inference is

generally not rebutted simply by a subsequent general statement by the juror that he or she can be fair and impartial," but instead, "[t]he level of investigation necessary once voir dire reveals potential juror bias will vary from case to case and is necessarily dependent on the juror's responses to the questions asked." *State v. Woolley*, 810 P.2d 440, 445 (Utah Ct. App. 1991), *overruled on other grounds as recognized by Robertson*, 2005 UT App 419. Here, the Juror was asked separately by the trial court, the prosecutor, and Fletcher's counsel if any of her associations or her son's experience would impact her ability to be impartial and she unequivocally answered that they would not. But the investigation did not end there. The Juror was also questioned about her perceptions of law enforcement, the use of confidential informants, her son's criminal history, and his progress and rehabilitation since his arrest. Taking into account the scope of the voir dire as a whole and the Juror's "responses to the questions asked," we conclude the appropriate level of investigation occurred here. *See id.*

¶24　Our conclusion that the trial court did not abuse its discretion is supported by other cases involving jurors who had prior experience with law enforcement. In *State v. Leleae*, 1999 UT App 368, 993 P.2d 232, we determined that the trial court did not abuse its discretion when a juror was seated who had trained under an officer-witness as part of a law enforcement training program fourteen or fifteen years earlier. *Id.* ¶¶ 32, 37. In *State v. Cobb*, 774 P.2d 1123 (Utah 1989), the Utah Supreme Court allowed a former police officer to sit on the jury. *Id.* at 1126–28. Our supreme court recognized that the former officer's initial responses in voir dire questions, including the statement that he had "very, very strong feelings about the taking of human life," raised facial issues of impartiality. *Id.* at 1126–27 (internal quotation marks omitted). However, the court determined that "subsequent questioning by counsel cleared up any doubts regarding [his] ability to be an impartial juror" and that the former officer's answers reflected "that he was willing to keep an

open mind and apply the law as the court instructed." *Id.* at 1127–28. Accordingly, no abuse of discretion was found on appeal for allowing the former officer to be seated. *Id.* at 1128. And in *Salt Lake City v. Almansor*, 2014 UT App 88, 325 P.3d 847, we determined that while a juror's "employment with Salt Lake County Criminal Justice Services" raised facial issues of impartiality, the juror's responses "did not indicate that he had any predisposition to favor or believe one side over the other." *Id.* ¶ 6.

¶25    Here, the Juror's responses amounted to explaining her son's criminal history and then statements that her son's experience, as well as her own, with law enforcement had been painful but ultimately positive overall. These statements certainly raised facial issues of impartiality. *See Cobb*, 774 P.2d at 1128. But it is apparent from the cases just discussed that prior positive associations with law enforcement are not enough on their own to disqualify a juror. Instead, a greater potential for bias or impartiality must be shown. And like the jurors in *Cobb* and *Almansor*, additional responses from the Juror revealed that she "was willing to keep an open mind," *see id.* at 1127, and "did not indicate that [she] had any predisposition to favor or believe one side over the other," *see Almansor*, 2014 UT App 88, ¶ 6. Based on the responses given by the Juror and the nature of the investigation and questioning conducted in this case, we conclude that the trial court could have reasonably determined "by a process of logic and reason, based on common experience," that the Juror could "stand in [an] attitude of indifference between the state and the accused." *See State v. Lacey*, 665 P.2d 1311, 1312 (Utah 1983) (per curiam) (citation and internal quotation marks omitted), *overruled on other grounds as recognized by Robertson*, 2005 UT App 419. Accordingly, we find no abuse of discretion in the trial court's decision to seat the Juror.

¶26    In summary, the inconsistencies in the Detective's testimony did not render it "inherently improbable," the trial court did not err in admitting the Detective's testimony under rule 602 of the Utah Rules of Evidence, and the trial court did not abuse its discretion in seating the Juror.

¶27    Accordingly, we affirm.

_____