**2018 UT App 21**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOHN MARTIN CARRELL,
Appellant.

Opinion
No. 20150924-CA
Filed February 1, 2018

Third District Court, West Jordan Department
The Honorable L. Douglas Hogan
No. 141400776

Ronald J. Yengich, Attorney for Appellant

Sean D. Reyes and Jeanne B. Inouye, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
GREGORY K. ORME and KATE A. TOOMEY concurred.

HARRIS, Judge:

¶1     Defendant John Martin Carrell (Defendant) drove a
school bus for children with special needs. A jury convicted
Defendant of sexually abusing two of these children in 2014.
Defendant appeals his convictions, and asks us to consider two
arguments. First, he asserts that the jury was improperly
instructed as to the elements and required mental states for his
charged crimes. Second, he contends that there was insufficient
evidence to support his convictions. We find Defendant's
arguments unpersuasive and therefore affirm his convictions.

BACKGROUND

¶2      In early 2014, Defendant had been a bus driver employed by Canyons School District (the District) for nearly five years. At that time, Defendant was assigned to drive "route 250," a bus route for elementary-school-aged children with special needs. This route included two separate daily circuits, one in the morning and another in the afternoon. C.B. (First Victim), a five-year-old girl, was one of the students on Defendant's morning bus route. Z.B. (Second Victim), also a five-year-old girl, was one of the students on Defendant's afternoon bus route.

¶3      During the relevant time period, Defendant would usually pick up First Victim near her home at around 8:30 a.m. and drop her off at school at about 8:40 or 8:45 a.m. He would then pick her up at school after class ended, and drop her back off at home at approximately 11:00 a.m. On most mornings, only four or five students rode on Defendant's morning bus route. Defendant would then pick up Second Victim near her home at 11:30 a.m., take her to school, pick her up at school after class, and then drop her back off at home by 3:00 p.m. Defendant's afternoon bus route was also used by only a handful of students.

¶4      Per District policy, Defendant received training regarding various security and safety features of his bus, as well as training regarding permissible and impermissible physical interaction with the children. Specifically, the District informed Defendant that the children, while riding on the bus, were required to sit in "star seats," which had seatbelt harnesses with straps across both shoulders and between their legs that buckled together near each child's lower midsection. The District further instructed Defendant that it was permissible for him to help the children get buckled into or unbuckled out of the star seats, but that it was normally not necessary or permissible for Defendant to touch them during this process. The District also instructed Defendant that, in all other contexts, physical contact with

children was to be kept to a minimum. For instance, it was permissible for a bus driver to "high-five" or "fist-bump" with the children, and even to accept a "side hug" if the child initiated it, but Defendant was aware that bus drivers were not to accept any other type of hug and were not allowed to initiate physical contact of any kind. As part of this training, Defendant also learned that his bus came equipped with surveillance cameras which began recording when the ignition key was turned on and would continue to record for fifteen minutes after the ignition was turned off. These cameras recorded many of Defendant's interactions with both victims.[1]

¶5 At the time, it was also District policy, at least for route 250, for the students to remain on the bus in Defendant's care, even after the bus had stopped at the school, until the students' individual teachers came outside and physically escorted them from the bus. Because the bus did not always arrive at exactly the same time each day, and because the teachers did not always emerge from the school at the same time each day, the period of time in which the students remained on the bus under Defendant's care varied each day, from just one or two minutes to as long as eight or ten minutes. First Victim's teacher was often one of the last teachers to emerge from the school, a fact which often resulted in First Victim (along with one other girl) being one of the last students on the bus in the morning.

¶6 While Defendant scrupulously followed the District policy of keeping the students on the bus until their teachers retrieved them, he did not always follow the other policies. For

---

1. Several portions of these recordings were presented as exhibits at trial and included in the record of this case. The recordings include audio, as well as visual images. We have reviewed those recordings prior to issuing this opinion, and some of the facts recited here are taken from those recordings.

example, he frequently helped the students unbuckle their star seat belts when the bus arrived at school. On several occasions during this unbuckling, Defendant passed by First Victim to help unbuckle other children, saving First Victim's unbuckling for last. Defendant succeeded in unbuckling the other children in just a few seconds' time, but routinely spent much longer—up to ninety seconds—unbuckling First Victim. Although the video footage does not always show the placement of Defendant's hands, in several instances he appears to continue touching First Victim even after she is unbuckled—the video shows First Victim's legs and shoulders visible in positions that would not be achievable were she still buckled in to the star seat, and shows that Defendant's arms were extended down towards her body. In one instance, First Victim struggles to emerge from the seat into the aisle while Defendant blocks her progress with his body.

¶7     After the children were unbuckled each morning, they were allowed to freely move about the interior of the bus until their teachers came to meet them. While other students moved about the bus playing, First Victim often gravitated toward Defendant, who usually passed the time seated in the driver's seat at the front of the bus. As First Victim approached him, Defendant often took her by the hand, shoulder, or side and pulled her towards him, positioning her either to sit on his lap or stand between his legs with her back to the other children and to the bus door. While First Victim and Defendant were positioned in this manner, Defendant's hands often were not visible to the camera. However, on several occasions, the video footage shows Defendant's left hand positioned somewhere on the lower midsection of First Victim's body, while his right hand was either extended towards the lower part of her body or extended straight out, holding her backpack at an angle that placed it between her body and the door of the bus. In some instances, Defendant's right hand can be seen cupping, resting on, or moving across First Victim's buttocks, and in one instance

Defendant's hand appears to be under First Victim's skirt. In several instances, while Defendant's left hand was somewhere out of view on or near the lower front of First Victim's body, Defendant's left shoulder can be seen moving up and down in short, rhythmic motions. On some occasions, Defendant moved his head close to First Victim's head and can be seen touching her face with his, apparently nuzzling or kissing her. Several times, after placing his left hand somewhere out of sight but apparently on or near the lower front of First Victim's body, Defendant brought that same hand to his face and can be seen seemingly smelling or licking his fingers.

¶8　　Whenever a teacher approached the bus to collect children from it, Defendant pushed First Victim away from him so that she was standing at some distance away from him while the teacher was present. Often, once the teacher departed, Defendant pulled First Victim back towards him and again apparently placed his left hand somewhere on the lower front of her body. In one of these instances First Victim can be heard telling Defendant, "You've been pulling my pants up."

¶9　　The cameras also recorded many of Defendant's interactions with Second Victim. On several occasions the video footage shows Defendant unbuckling Second Victim and then, after she was unbuckled, placing his hands on her clothed genitals for several seconds. In one instance, Defendant also placed his left hand between Second Victim's legs and lifted her off the floor while holding her clothed genitals. At the time, Second Victim was not yet verbal, but appeared to struggle during some of these interactions.

¶10　　On April 22, 2014, while First Victim's father was getting her ready for school, she remarked that she "can ride on the bus seat today again." First Victim's father asked her if the driver was letting her pretend to drive the bus, and she responded by saying "no" but said Defendant let her sit on his lap and "[made]

it soft for [her]." As she said this, First Victim rubbed her crotch. The next day, First Victim's father raised the subject again and asked her to clarify what she did when she sat on the bus seat. In response, First Victim once more rubbed her crotch and said, "Does that feel good?" After this conversation, First Victim's father called the District and informed Defendant's supervisor that he was concerned that Defendant might be sexually abusing his daughter.

¶11    The District then placed Defendant on administrative leave, obtained the video footage from Defendant's bus, and referred the matter to the police. On May 1, 2014, after the police had reviewed the video footage pertaining to First Victim, a detective interviewed her. During this interview, First Victim was largely unresponsive to the detective's questions. She was quiet, did not make eye contact, looked down at her hands, and responded in the negative when asked if she knew why she was being interviewed. When prompted that she was being interviewed because her father said something might have happened to her, First Victim responded by saying, "I've got a sore throat." Despite multiple attempts to rephrase the question, First Victim continued to remain quiet, to refuse to make eye contact, and to state that she did not know why she was being interviewed. After the detective pressed the issue several times, First Victim finally said that Defendant sometimes kissed her on the bare skin of her upper chest. She provided no further relevant information to the detective at this time. Following this interview, and after reviewing the video footage, the State charged Defendant with 23 counts of aggravated sexual abuse of a child for his interactions with First Victim.

¶12    First Victim began meeting with a therapist. During therapy, First Victim was more forthcoming about what she had previously told her father. Upon learning this, the same detective conducted a second interview with First Victim on February 18, 2015. This time, First Victim was much more

responsive, made significantly more eye contact, rarely looked down at her hands, and was smiling and happy in the detective's company. During that second interview, First Victim told the detective that Defendant touched her "peepee" at least once per day. She clarified that these touches made her feel uncomfortable, that Defendant would ask her whether the touching hurt or made her feel good, and that the touches were with Defendant's hand and were sometimes under her clothes. Towards the end of the interview, the detective asked First Victim if anyone had "told her what to say." First Victim answered in the affirmative and said that her therapist had told her what to say. Subsequent to this interview, the therapist clarified for the detective that she had told First Victim that the detective was a friend of the therapist's and that it was okay for First Victim to tell the detective the truth.

¶13 Following Defendant's arrest, Second Victim's father contacted the State and asked that prosecutors review the video footage during periods of time when Second Victim rode the bus. Second Victim's father informed the State that shortly after Defendant became Second Victim's bus driver, Second Victim began having "behavioral issues" on the bus, including becoming angry and "acting out." Second Victim also began "cry[ing] not to go on the bus." Although Second Victim was nonverbal and could not be effectively interviewed, after reviewing the video footage the State amended its information to charge Defendant with an additional ten counts of aggravated sexual abuse of a child for his interactions with Second Victim.

¶14 At trial, the State relied heavily on the previously described video footage, excerpts of which were played for the jury. In addition, First Victim's father testified about his conversations with First Victim that led him to contact the District. First Victim also testified at trial, and stated that Defendant touched her "peepee" "like every day" she rode the bus, usually about three times each day. Second Victim's father

also testified about her behavioral changes after Defendant became her bus driver.

¶15 At the conclusion of the State's case-in-chief, Defendant moved for a directed verdict dismissing all charges against him. He argued that the evidence presented was not sufficient to establish that he had touched First and Second Victim "with the intent to arouse or gratify [his] sexual desire," and that there was no evidence he intended to take indecent liberties with either victim. The trial court denied Defendant's motion and ruled that "based upon the evidence presented during the State's case in chief . . . there [had] been sufficient evidence presented from which a jury acting reasonably could convict [Defendant]."

¶16 Before the jury began deliberating, Defendant made two objections to the State's proposed jury instructions. First, he objected to the manner in which the instructions presented the mental state requirements for aggravated sexual abuse of a child. The elements instructions informed the jurors that they could not find Defendant guilty on any count unless they found both (1) that Defendant "[k]nowingly or intentionally [] touched any part of the genitals [] or buttocks of [First Victim] or otherwise took indecent liberties with [First Victim]," and (2) that Defendant did so "[w]ith the intent to arouse or gratify the sexual desires of any person."[2] Separate instructions defined the terms "intentionally" and "knowingly."[3] Defendant argued that

---

2. The elements instruction with respect to Second Victim was identical, but omitted the reference to "buttocks" because the State alleged that Defendant touched Second Victim on her clothed genitals but not on her buttocks.

3. Jury Instruction No. 30 informed the jury that a person acts "intentionally" or "with intent" "when his conscious objective is to" either "engage in certain conduct" or "cause a certain result." Jury Instruction No. 31 informed the jury that a person acts

(continued…)

these instructions were confusing because they did not "properly instruct the jury which intent goes to which element." In response, the trial court noted that the instructions followed the language of Utah's model jury instructions, and expressed the belief that "as the jury goes through the element[s] instruction, when they get to a word that's a defined term in the instructions, they'll look to that definition." Accordingly, the trial court overruled Defendant's objection with respect to the mental state instructions.

¶17   Second, Defendant objected to the inclusion, in the elements instruction, of the phrase "or otherwise took indecent liberties with [First or Second Victim]," and to the inclusion of the language involving "buttocks" with respect to First Victim. Defendant argued that because First Victim testified that he touched her "peepee" but had not described him touching her buttocks, the jury should not have been instructed that they could consider whether he touched First Victim's buttocks. In addition, Defendant argued that the evidence the State presented did not demonstrate that he "took indecent liberties" with either First or Second Victim, and that it was therefore inappropriate to instruct the jury on that element. In response, the trial court found that "the video speaks for itself" and expressed its belief that "the video that has been presented in court is reflective and representative of what the instructions contain." Accordingly, the trial court overruled Defendant's objection with respect to the "buttocks" and "indecent liberties" instructions to the jury.

¶18   After deliberating, the jury convicted Defendant on 19 of the 33 charged counts, including 13 of the 23 counts regarding

---

(…continued)
"'knowingly' when the person is aware of the nature of his conduct, or is aware of the particular circumstances surrounding his conduct."

First Victim and six of the ten counts regarding Second Victim. Defendant appeals.

## ISSUES AND STANDARDS OF REVIEW

¶19 Defendant raises three issues on appeal. First, he contends that the trial court erred by allowing the term "buttocks" (as to First Victim) and the language describing the "indecent liberties" theory of aggravated sexual abuse of a child (as to both victims) to remain in the jury instructions. "Whether a trial court properly instructed the jury is a question of law, which we review for correctness." *Cheves v. Williams*, 1999 UT 86, ¶ 37, 993 P.2d 191 (citation and internal quotation marks omitted). If an error is found in jury instructions, reversal is warranted only if there is a reasonable probability that the error affected the outcome of the case. *State v. Tinoco*, 860 P.2d 988, 990 (Utah Ct. App. 1993).

¶20 Second, Defendant contends that the trial court erred by presenting the prosecution's proposed mental state instructions to the jury. Again, whether a trial court properly instructed a jury is a question we review for correctness. *Id.* at 989–90.

¶21 Finally, Defendant contends that there was insufficient evidence to convict him and that the trial court therefore erred in denying his motion for a directed verdict.[4] When considering a

---

4. In making his arguments on appeal—both his arguments regarding jury instructions and his argument regarding insufficiency of the evidence—Defendant does not engage in a count-by-count analysis of the evidence. Instead, he argues that the evidence was insufficient to support inclusion of "indecent liberties" language in the jury instructions for *any* of the counts charged (and insufficient to support inclusion of "buttocks" language for *any* of the counts charged involving First Victim),

(continued…)

challenge to the sufficiency of the evidence, we review the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict. *State v. Germonto*, 868 P.2d 50, 55 (Utah 1993). We will reverse a guilty verdict for insufficient evidence only when the evidence is so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crimes of which he was convicted. *State v. Nielsen*, 2014 UT 10, ¶ 46, 326 P.3d 645.

ANALYSIS

I

¶22 Defendant first contends that the trial court's jury instructions regarding the elements of the crimes included language that—while not incorrect as a legal matter—was unsupported by the evidence the State presented at trial. Defendant makes two arguments in this regard. First, Defendant asserts that there was insufficient evidence to support inclusion of language stating that taking "indecent liberties" could be a basis for a finding of aggravated sexual abuse of either victim. Second, Defendant asserts that there was insufficient evidence to support inclusion of language stating that touching First Victim's "buttocks" could be a basis for a finding of aggravated sexual abuse of First Victim. We find Defendant's arguments unpersuasive.

---

(…continued)

and was also generally insufficient to convict him on *any* of the counts charged. Because Defendant makes no effort to engage in a count-by-count analysis, neither do we.

A

¶23 Under Utah law, a person commits "sexual abuse of a child" if that person "touches the anus, buttocks, or genitalia of any child, the breast of a female child, or otherwise takes indecent liberties with a child," and does so "with the intent to arouse or gratify the sexual desire of any person." Utah Code Ann. § 76-5-404.1(2) (LexisNexis 2017). The offense is considered "aggravated" if, among other things, the person committing it "occupied a position of special trust in relation to the victim." *Id.* § 76-5-404.1(4)(h). Under the statutory scheme, "any touching, even if accomplished through clothing, is sufficient to constitute" "touching" for the purposes of a prosecution for sexual abuse of a child. *Id.* § 76-5-407(3)(b) (LexisNexis 2017).[5]

¶24 The phrase "indecent liberties" is not defined by statute. Our supreme court, however, has declared that the term is not unconstitutionally vague, as long as it is "considered as referring to conduct of the same magnitude of gravity as that specifically described in the statute." *In re J.L.S.*, 610 P.2d 1294, 1296 (Utah 1980).

¶25 In this case, the jury was presented with "elements" instructions on each of the 33 counts, and those instructions all stated that Defendant could not be convicted of the offenses unless the jury found each of six elements beyond a reasonable doubt:

---

5. In cases asserting violations of certain other statutes, such as for "forcible sexual abuse" of a person "14 years of age or older," Utah Code Ann. § 76-5-404(1) (LexisNexis 2017), "touching" is required to be by skin-to-skin contact, *see State v. Jacobs*, 2006 UT App 356, ¶ 7, 144 P.3d 226. In cases alleging sexual abuse of a child, however, "touching" can be accomplished through clothing. *See* Utah Code Ann. § 76-5-407(3)(b) (LexisNexis 2017).

1. That on [the date of the offense];

2. The Defendant, John Carrell;

3. Knowingly or intentionally, touched any part of the genitals [or buttocks] of C.B. [or Z.B.], or otherwise took indecent liberties with C.B. [or Z.B.];

4. With the intent to arouse or gratify the sexual desires of any person; and

5. At the time of said conduct, C.B. [or Z.B.] was under 14 years of age; and

6. The Defendant occupied a position of special trust in relation to C.B. [or Z.B.].

¶26    Further, the jury was instructed as to the definition of "indecent liberties," as follows:

"Indecent liberties" is defined as conduct that is as serious as touching the anus, buttocks, or genitals of a person or the breast of a female.

In deciding whether conduct amounts to indecent liberties, use your judgment and common sense. You may consider factors such as: (1) the duration of the conduct, (2) the intrusiveness of the conduct against the alleged victim, (3) whether the alleged victim requested that the conduct stop, (4) whether the conduct stopped upon request, (5) the relationship between the alleged victim and the defendant, (6) the alleged victim's age, (7) whether the alleged victim was forced or coerced to participate, and any other factors you consider relevant.

> The fact that touching may have occurred over clothing does not preclude a finding that the conduct amounted to indecent liberties.

¶27 Defendant does not contend that these jury instructions were legally inaccurate. Indeed, these instructions correctly state the law, as derived from both statutes and case law. *See In re P.G.*, 2015 UT App 14, ¶ 19, 343 P.3d 297 (reciting the elements of sexual abuse of a child); *State v. Lewis*, 2014 UT App 241, ¶ 12, 337 P.3d 1053 (discussing "indecent liberties" and referring to the Model Utah Jury Instruction on the topic as "appropriate"); *see also* Model Utah Jury Instructions 2d (MUJI) CR1601 (2016), https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=44#1601 [https://perma.cc/D4UJ-STGW] (defining "indecent liberties"); *id.* CR1612, https://www.utcourts.gov/resources/muji/inc_list.asp?action=showRule&id=44#1612 [https://perma.cc/6P8M-R5B5] (defining the elements of sexual abuse of a child).

¶28 Instead, Defendant contends that, as a factual matter, the record does not contain sufficient evidence to establish that he took "indecent liberties" with either of the victims. Defendant appears to concede that the jury was properly instructed that it could convict him if it found that he had committed a "touching" of either victim's genitals. But Defendant argues that there was no evidence involving any non-"touching" conduct "that could have risen to the level of 'indecent liberties'" with respect to either victim, and therefore the language in the jury instructions regarding "indecent liberties" should have been deleted. We are unpersuaded.

¶29 In advancing this argument, Defendant first notes that First Victim did not offer testimony that could support a finding of "indecent liberties," because her testimony was specific to "touching." Indeed, First Victim stated that Defendant touched her "peepee," conduct that (assuming that First Victim intended

that term to refer to her genitals) would constitute a "touching" under the statute. On this point, Defendant is correct. First Victim's testimony was certainly sufficient to support a conclusion that Defendant "touched" her in ways that constituted sexual abuse of a child, but there is nothing in her testimony that can support a conclusion that Defendant engaged in conduct, not sufficient to constitute a "touching," that could amount to "indecent liberties."

¶30 The State defends the jury instructions by pointing to the video evidence that was presented to the jury, and arguing that the video footage contains evidence of certain conduct that, although perhaps not sufficient to constitute a "touching" as that term is defined in the statute, nevertheless could amount to "indecent liberties." Defendant disagrees, arguing that the jury could not have reasonably inferred, simply from the video evidence, that he was guilty of taking "indecent liberties" with either victim. According to Defendant's characterization, the video evidence is too inconclusive, and does not often enough show the exact location of Defendant's hands, for the jury to be able to use that evidence to support a finding of "indecent liberties."

¶31 Our characterization of the video footage differs from Defendant's. While Defendant is correct that, at times, one cannot determine the precise location of Defendant's hands, it is clear for several minutes-long periods that his left hand was somewhere on the front of First Victim's body while his left shoulder moved up and down in short, rhythmic motions. On certain occasions following this, it is also clear that Defendant brought his left hand to his face somewhere near his mouth or nose, apparently to lick or smell his fingers. Further, Defendant is incorrect when he states that it is never clear where his right hand was and when he states that the video footage only portrayed First Victim standing between his legs. In fact, the footage clearly shows Defendant's hand moving on or around

First Victim's clothed buttocks on several occasions, and on one occasion his right hand was somewhere beneath her skirt. Moreover, First Victim can be seen sitting on Defendant's lap on several occasions. In addition, we note that Defendant can be observed nuzzling or kissing First Victim, running his fingers through her hair, and often initiating the contact between them and pulling her towards him when no other adults were present and then pushing her away when the teachers approached the bus. During several of his encounters with First Victim, the footage also shows that Defendant held her backpack between her body and the door of the bus, in an apparent effort to block people outside the bus from seeing him and First Victim.

¶32    A factfinder may draw reasonable inferences from evidence presented to it, regardless of whether that evidence is testimonial evidence or video evidence. *See State v. Lomu*, 2014 UT App 42, ¶ 10, 321 P.3d 235 (noting that the "jury could have reasonably inferred" from a combination of testimonial and video evidence that the defendant "knew that [a] threat was being made"). In the past, we have noted that inferences made from evidence should be "based on logic and reasonable human experience" and that such inferences are "reasonable and not speculative" when they "support a conclusion that one possibility is more probable than another." *State v. Cristobal*, 2014 UT App 55, ¶ 7, 322 P.3d 1170 (citation and internal quotation marks omitted).

¶33    Here, while we stress that the jury could reasonably have inferred that Defendant's conduct in each of the described instances amounted to a "touching" of First Victim, the jury could also have reasonably inferred that in at least some instances Defendant was not directly touching First Victim's "anus, buttocks, or genitals" but instead was touching very *near* them during moments when the general location of his hands was clear but their exact configuration or position was not. The jury could also have considered the fact that First Victim often

sat on Defendant's lap, and that Defendant on occasion appeared to be nuzzling or kissing her face. As part of its "indecent liberties" analysis, the jury was also instructed that it could consider other factors, such as the relationship between First Victim and Defendant, First Victim's age, and the duration of the conduct. In light of all of this, we conclude that the jury, based on logic and reasonable human experience, could have reasonably inferred from the video evidence that Defendant was, on at least some of the occasions depicted, engaging in conduct toward First Victim that was of the same magnitude of gravity as if he was touching her breasts, vagina, anus, or buttocks.

¶34 Defendant also contends that the video evidence regarding Second Victim was insufficient to support inclusion of "indecent liberties" language in the jury instructions. Defendant maintains that, when one views the video evidence, "it is impossible to determine, beyond a reasonable doubt, if [Defendant's] hand was even touching [Second Victim's] genitals." Again, we view the video footage differently. The footage depicts Defendant's hand moving rapidly toward Second Victim's clothed genitalia after she is unbuckled and remaining on or near her genitals outside her clothing for several seconds as she struggles and squirms away. One video additionally shows Defendant picking up Second Victim by her crotch (with his hand cupping or under her crotch) and holding her in the air for several seconds. Because the video footage shows Defendant grabbing Second Victim's crotch on several occasions but does not display the exact position of his fingers, we conclude that the jury could plausibly have determined either that Defendant touched Second Victim's genitals—a touching—or that Defendant touched very near Second Victim's genitals in a manner amounting to the same magnitude of gravity as if he was touching her genitals.

¶35 Accordingly, we reject Defendant's argument that the evidence was insufficient to support the inclusion of "indecent

liberties" language in the jury instructions with regard to both victims.

B

¶36  Defendant's next argument is premised on the assumption that there was insufficient evidence in the trial record of any touching of First Victim's buttocks, and therefore no such instruction should have been given. Defendant argues that, because First Victim testified only that he touched her "peepee," and did not verbally describe him touching her buttocks, the jury should not have been instructed that it could consider whether Defendant touched First Victim's buttocks. Defendant goes so far as to argue that "[n]o evidence was admitted involving the touching of [First Victim's] buttocks." We disagree.

¶37  First, we again note that, while Defendant correctly observes that First Victim's oral testimony did not describe him touching her buttocks, the video footage shows Defendant touching First Victim on (or very near) her buttocks on several occasions. The footage also clearly depicts Defendant's right hand under First Victim's skirt at least once. On other occasions, the precise location of Defendant's hands cannot be seen, but because of the position of Defendant's body relative to First Victim's, it is clear that one of Defendant's hands is between their bodies and could very well be on First Victim's buttocks. Further, on at least one occasion, First Victim can be heard remarking that Defendant had been "pulling [her] pants up."

¶38  As noted previously, a jury is entitled to draw inferences from evidence, "based on logic and human experience," that are "reasonable and not speculative" and that "support a conclusion that one possibility is more probable than another." *Cristobal*, 2014 UT App 55, ¶ 7 (citations and internal quotation marks omitted). It would not have been improper for the jury to find, after viewing the video evidence, that Defendant touched First

Victim's buttocks. Thus, we conclude that the evidence was sufficient to support inclusion of the word "buttocks" in the elements jury instructions regarding First Victim.

¶39    Because the "buttocks" and "indecent liberties" portions of the jury instructions were supported by evidence presented at trial, we conclude that the trial court did not err in giving those instructions to the jury.

## II

¶40    Next, Defendant raises an issue with the trial court's instructions regarding the mental state required for conviction. Specifically, Defendant contends that the trial court erred by providing the jury with mental state instructions defining "intentionally" and "knowingly" that were separate from the instructions listing the elements of aggravated sexual abuse of a child. We find no improprieties in the manner in which the trial court instructed the jury regarding the required mental state.

¶41    Here, the elements instruction presented to the jury for aggravated sexual abuse of a child stated that the jury could not find Defendant guilty unless it found both (1) that Defendant "[k]nowingly or intentionally . . . touched any part of the genitals . . . or buttocks of [First Victim] or otherwise took indecent liberties with [First Victim]," and (2) that Defendant did so "[w]ith the intent to arouse or gratify the sexual desires of any person."[6] The terms "knowingly" and "intentionally" were defined in separate instructions.

¶42    Defendant concedes that all of these instructions are legally correct. Indeed, the trial court used the Model Utah Jury

---

6. As noted previously, the elements instruction with respect to Second Victim was identical, but omitted the reference to "buttocks."

Instructions for both the elements of aggravated sexual abuse of a child and for the definitions of "intentionally" and "knowingly." Nevertheless, Defendant maintains that the trial court should have provided additional guidance to the jury as to which level of intent was applicable to each element of aggravated sexual abuse. Defendant posits that the jury may have been confused about whether it could convict Defendant for "intentionally or knowingly" touching or taking indecent liberties with First or Second Victim without finding that he also specifically intended to arouse or gratify the sexual desires of any person. To support this contention, Defendant cites *State v. Hutchings*, 2012 UT 50, 285 P.3d 1183, which he maintains is "identical" to this case with respect to this issue.

¶43    In *Hutchings*, a defendant was charged with aggravated assault, a crime with "two elements, each with different mental states: (1) committing a simple assault and (2) having the intent to cause serious bodily injury." *Id.* ¶ 11. The first element has no statutorily prescribed mental state, and therefore a defendant meets the first element if he commits simple assault with either "intent, knowledge, or recklessness." *Id.* ¶ 12 (quoting Utah Code Ann. § 76-2-102 (LexisNexis 2017)). The second element has a statutorily-prescribed mental state, requiring that a defendant commit the assault with "intent to cause a serious bodily injury." *Id.* The main issue in *Hutchings* was whether this second element could be met where a defendant merely intended to commit *the act* that ended up resulting in serious bodily injury, or whether it could be met only if a defendant actually intended to cause the injury. Our supreme court ruled that "[t]he mere intent to act, without the intent to cause the result, is insufficient under the aggravated assault statute," and that "[c]ulpability for aggravated assault requires an actual intent to cause the serious bodily harm." *Id.* ¶ 14. Based on this holding, the court concluded that the jury instruction regarding intent was potentially confusing, because it stated that "'[a] person engages in conduct intentionally . . . when it is his

conscious objective or desire to engage in the conduct *or cause the result*.'" *Id.* ¶ 19 & n.6 (emphasis added).

¶44 Defendant attempts to draw a parallel with *Hutchings* by asserting that, in this case, there are also two elements, each with a separate mental state requirement: he must have both (a) *intentionally or knowingly* touched the victims' private parts or taken indecent liberties with the victims, and (b) done so with a specific *intent* to arouse sexual desire. Defendant argues that it would have been better for the elements instructions for aggravated sexual abuse of a child to be combined with the instructions providing the definition of "intentionally" and "knowingly."

¶45 We disagree. The potential for confusion in *Hutchings* stemmed from the statutory interpretation question that the court resolved in that case, namely, whether the aggravated assault statute required a defendant to actually intend to injure the victim, or whether it was sufficient for a defendant to merely intend to commit the act that ended up injuring the victim. We have no such statutory interpretation question before us here, and therefore we do not perceive the instructions given by the trial court to have been confusing.

¶46 Indeed, we find persuasive the State's argument that the instructions provided to the jury "presented no potential for confusion similar to that addressed in *Hutchings*." By stating explicitly that the Defendant could not be found guilty unless he both "[k]nowingly or intentionally . . . touched any part of the genitals . . . or buttocks of [First Victim] or otherwise took indecent liberties with [First Victim]" *and* that he did so "[w]ith the intent to arouse or gratify the sexual desires of any person," the instructions put the jury on notice that any touching Defendant committed would not only need to itself be "intentionally or knowingly" committed, but also, to warrant a conviction, Defendant would have had to commit the touching

with the particular intent to arouse or gratify. Further, Defendant's argument does not take into account the longstanding rule that we read jury instructions "in their entire context and give[] meaning in accordance with the ordinary and usual import of the language as it would be understood by lay jurors." *State v. Kennedy*, 2015 UT App 152, ¶ 28, 354 P.3d 775 (citation and internal quotation marks omitted). When the jury encountered language in an instruction describing a particular mental state, we presume that they interpreted that language in light of the definitional instructions they were given.

¶47    Accordingly, the instructions used in this case regarding *mens rea* were not improper, and the trial court did not err when it provided them to the jury.

III

¶48    Finally, Defendant contends that the district court should have granted his motion for a directed verdict, and thus that the jury's decision to convict him should be overturned, because the State's evidence was "inconclusive" as to both (a) whether Defendant committed an illegal touching of either victim and (b) whether Defendant did so "with the specific intent to arouse or gratify his sexual desires." After review of the evidence, including viewing the video footage that was admitted into evidence at trial, we disagree.

¶49    When considering whether to overturn a jury's verdict on the ground that the evidence presented was insufficient to support a conviction, we consider the evidence and all reasonable inferences therefrom in the light most favorable to the jury's verdict and uphold the verdict if "we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime have been proven beyond a reasonable doubt." *State v. Mills*, 2012 UT App 367, ¶ 40, 293 P.3d 1129 (brackets, citation, and internal quotation marks omitted). In the present case, the verdict must stand so long as

some evidence exists from which a reasonable jury could have found both (a) that Defendant touched the buttocks (of First Victim) or genitalia (for either victim) or otherwise took indecent liberties with either victim, and (b) that Defendant did so with intent to arouse or gratify the sexual desire of any person.

¶50 As a threshold matter, Defendant urges us to disregard First Victim's testimony as inherently improbable before making our determination regarding sufficiency of the evidence. While normally the court must accept a jury's determination as to the credibility of witnesses and the weight to afford witness testimony, a court may choose to disregard certain testimony on a sufficiency of the evidence review if that testimony is "inherently improbable." *State v. Robbins*, 2009 UT 23, ¶ 16, 210 P.3d 288. In *Robbins*, our supreme court determined that courts possess limited "discretion" to "reevaluate the jury's credibility determinations," but "only when the court is convinced that the credibility of the witness is so weak that no reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* ¶¶ 18–19. Courts are empowered to exercise this limited discretion "only in those instances where (1) there are material inconsistencies in the testimony and (2) there is no other circumstantial or direct evidence of the defendant's guilt." *Id.* ¶ 19; *accord State v. Prater*, 2017 UT 13, ¶ 33, 392 P.3d 398.

¶51 Neither of those prerequisites is present here. In support of his contention that First Victim's testimony was materially inconsistent, Defendant notes that "[First Victim] never actually told her father that [Defendant] was touching her 'peepee' under her clothes," but instead "only rubbed herself on the outside of her clothes when talking to her father about sitting on the bus seat." In addition, Defendant points out that First Victim did not talk to the detective who interviewed her about Defendant's alleged conduct during her first interview, and stated during the

second interview nearly a year later that her therapist "told her what to say."[7] While these facts may certainly provide fodder for cross-examination or for closing argument, they are not the sort of "material inconsistencies" referenced in *Robbins* or *Prater*. This is so for two reasons.

¶52 First, we note that Defendant's recitation of the evidence is selective. Although it is true that First Victim "rubbed herself on the outside of her clothes while talking to her father about sitting on the bus seat," as Defendant asserts, Defendant omits the fact that First Victim also told her father that Defendant "made it soft" for her. Defendant also fails to mention that First Victim, upon being asked about the bus driver for a second time, rubbed her crotch again and said, "[d]oes that feel good?" In addition, while First Victim was indeed unresponsive during her first interview with the detective and stated during her second interview that her therapist "told [her] what to say," Defendant omits the therapist's explanation that she simply told First Victim to tell the truth to the detective.

¶53 Second, we note that even if Defendant's description of First Victim's testimony were complete, Defendant still would not succeed on a *Robbins* challenge. The mere fact that a witness's account changes between her initial interview with police and her testimony at trial is by itself insufficient. *See Prater*, 2017 UT 13, ¶ 39 (noting that mere inconsistency with prior testimony does not render subsequent testimony

---

7. Defendant also brings up the fact that during one account, First Victim mentioned that Defendant sometimes touched her while she was sitting on his lap. Defendant takes exception to this, claiming that "none of the video showed [First Victim] ever sitting on [Defendant's] lap." This is incorrect. In fact, the video evidence shows First Victim sitting on Defendant's lap on several occasions.

"'apparently false'" because "[t]he question of which version of [the witnesses'] stories was more credible is the type of question we routinely require juries to answer"). In order to meet the first element of the *Robbins* test, the witness's testimony at trial must be internally inconsistent; the fact that a witness's trial testimony is somewhat at odds with other evidence in the case, including perhaps that witness's own prior statement, is not enough to render that testimony "inherently improbable."

¶54     In addition, the second *Robbins* prerequisite is not met here. Other circumstantial and direct evidence of Defendant's guilt exists, both in the testimony of First Victim's father and in the video evidence showing Defendant's interactions with First and Second Victim. These pieces of evidence corroborate First Victim's testimony, and thus are fatal to Defendant's *Robbins* argument. Because neither element of the *Robbins* test is met here, the trial court properly declined to exercise its discretion to disregard the jury's assessment of First Victim's credibility.

¶55     Because First Victim's testimony was not inherently improbable, the jury had "extraordinarily broad" latitude to assess her credibility, *Lyon v. Bryan*, 2011 UT App 256, ¶ 10, 262 P.3d 1199, and assign her testimony whatever weight it felt was appropriate. Given that First Victim testified at trial that Defendant touched her "peepee" "like every day," her testimony *alone* would have been sufficient to allow a reasonable jury to find that the elements of aggravated sexual abuse had been proven beyond a reasonable doubt with respect to each charged instance regarding First Victim.

¶56     But the jury in this case was not obligated to rely solely on First Victim's testimony. Instead, it also had access to the video evidence, which corroborated First Victim's testimony. As we previously noted, the video evidence shows Defendant touching First Victim's clothed buttocks and placing his hands under her skirt on several occasions, and on other occasions shows his

hands somewhere low on her body while his shoulder rhythmically moves up and down. The video evidence also shows Defendant grabbing Second Victim's clothed genitals for several seconds on several occasions, often while she struggles. From this, a reasonable jury could have inferred that Defendant either touched or took "indecent liberties" with both First and Second Victim.

¶57   Defendant finally argues, with respect to both First and Second Victim, that even if the State had proven beyond a reasonable doubt that Defendant touched First and Second Victim's genitalia, the State did not allege sufficient evidence to establish that he did so "for the purpose of causing arousal or sexual gratification," especially "[g]iven the insignificant amount of time that [Defendant] is alleged to have touched [Second Victim]." When specific intent is an element of a crime, prosecutors must prove that intent beyond a reasonable doubt. *See State v. Cooley*, 603 P.2d 800, 802 (Utah 1979). However, intent "need not be proved by direct evidence" but "may be inferred from the actions of the defendant or from surrounding circumstances." *State v. Murphy*, 674 P.2d 1220, 1223 (Utah 1983). In fact, because "'intent . . . is a state of mind, which is rarely susceptible of direct proof,'" a defendant's intent "'can be inferred from conduct and attendant circumstances in the light of human behavior and experience.'" *State v. Robertson*, 2005 UT App 419, ¶ 15, 122 P.3d 895 (quoting *State v. Brooks*, 631 P.2d 878, 881 (Utah 1981)).

¶58   In this case, the jury had before it testimony from First Victim that Defendant touched her genitals every day, video evidence that corroborated First Victim's account, and video evidence showing Defendant placing his hand on Second Victim's genitals after she was already unbuckled from her seat and despite her struggling. The video evidence further showed Defendant appearing to smell or lick his fingers on several occasions after touching First Victim. In the past, we have

indicated that a jury may properly infer a defendant's intent to gratify his sexual desires from that defendant's decision to touch a child's genitals. *See State v. Hall*, 946 P.2d 712, 724 (Utah Ct. App. 1997). Further, we note that Defendant cites no case law supporting his inference that he would need to touch Second Victim's genitals for a period longer than several seconds in order for the jury to properly infer he intended to cause the arousal or sexual gratification of any person. The evidence before the jury was sufficient to support the inference that Defendant touched First and Second Victim for his own arousal or sexual gratification.

¶59 First Victim's testimony was not inherently improbable, and the jury was properly allowed to consider it. That testimony, coupled with the other evidence introduced in the case, including the video evidence, was sufficient to support the jury's verdict.[8] Accordingly, the trial court did not err in denying Defendant's motion for a directed verdict.

CONCLUSION

¶60 The trial court did not err in including, in the jury instructions, the term "buttocks" or language describing

---

8. We reviewed the video footage associated with not only the incidents for which the jury convicted Defendant, but also the incidents for which the jury acquitted Defendant. As noted, Defendant does not ask us to, and we do not, engage in a count-by-count analysis of the arguments presented. However, we note that, in general, there is a qualitative difference in behavior between the incidents for which Defendant was convicted and the incidents for which he was acquitted. By all appearances, the jury did a thorough job of analyzing each separately-charged incident and convicting Defendant only on the charges for which it found convincing evidence of guilt.

"indecent liberties," and did not err in refusing to combine the mental state and elements instructions. The trial court also did not err in denying Defendant's motion for directed verdict, because the evidence in the record amply supported Defendant's convictions.

¶61    Affirmed.

———