2019 UT App 138

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOHN ATEM JOK,
Appellant.

Opinion
No. 20180138-CA
Filed August 15, 2019

Third District Court, Salt Lake Department
The Honorable Ann Boyden
The Honorable Vernice S. Trease
No. 121908775

Andrea J. Garland, Attorney for Appellant

Sean D. Reyes and Jonathan S. Bauer, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and DIANA HAGEN concurred.

MORTENSEN, Judge:

¶1     John Atem Jok was accused of sexually assaulting an acquaintance (Victim) while she slept. Jok was charged with and convicted at a bench trial of two counts of sexual battery. Alleging that Victim's testimony was inherently improbable, Jok contends that there was insufficient evidence to convict him, and he appeals. We affirm.

## BACKGROUND[1]

### *The Crime*

¶2 Victim lived in a two-bedroom apartment she shared with a friend (Roommate). Roommate's three children and boyfriend also lived at the apartment, although the boyfriend was not present on the night in question. Roommate and her children slept in the two bedrooms, and Victim slept on one of the apartment's two couches, where she kept sheets, pillows, and blankets for that purpose. She had previously been living with her mother, and although she had a learning disability and was receiving Social Security disability benefits, she moved in with Roommate because she wanted to be on her own.

¶3 Accompanied by Roommate's friend (Friend), Jok and another man, David Deng Akok, visited the apartment around 5 p.m. on September 15, 2012.[2] Victim knew Friend, but she had never met Jok or Akok. Jok, Akok, Friend, Roommate, and Victim listened to music and drank beer for an hour, at which time Akok left to drive Friend to work. Jok stayed at the apartment, sitting on the living room couch until Akok returned. Upon Akok's return about fifteen minutes later, Jok and Akok left to purchase more alcohol. They returned with a bottle of vodka and a case of beer. Jok, Akok, Roommate, and Victim

---

1. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard. However, we present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *State v. Nichols*, 2003 UT App 287, ¶ 2 n.1, 76 P.3d 1173 (cleaned up).

2. The facts recounted here are drawn from Victim's trial testimony, unless otherwise specified.

continued to drink and listen to music. Jok and Akok drank beer, and Victim drank vodka mixed with juice. Victim stated that she stopped drinking before midnight because she never drinks on Sunday.

¶4     Roommate went to bed in her room around 1 a.m. Sometime later, Victim fell asleep on the couch where she typically slept. Although she did not remember what time she fell asleep, she recalled that she had a headache and was still wearing her t-shirt, bra, underwear, and pants. Victim said that Jok and Akok were sitting on the couch with her when she fell asleep, but she expressed some confusion about their relative locations.

¶5     Victim testified at trial that she awoke to Jok and Akok trying to touch her. Jok placed his hands under Victim's shirt and touched her breasts. She told him to stop and pushed his hands away, and he said "okay" and stopped rubbing her breasts. But Jok then moved his hand under Victim's pants and underwear, putting his finger inside her vagina. Victim said that she felt a "[s]harp pain," she told Jok "no" and to stop, and Jok then stopped touching her.

¶6     After Jok stopped touching her, Victim said that Akok began touching her, got on top of her, and pulled down her pants and underwear. She pulled them back up, but he pulled them down again, pinned Victim with his hands, and raped her. Victim begged, "Please, no, . . . stop." Victim recalled asking Akok to stop more than ten times. While Akok was raping Victim, Jok sat on another couch and said, "It's okay." Victim did not call out to Roommate for help during the rape because she thought Akok and Jok "would stop" in response to her saying "no."

¶7     Victim was able to get up after Akok "was done." Akok wanted her to go to his house "to sleep in his bed," but Victim declined and told him she was staying at her apartment. She

went to the bathroom to clean up and then into her Roommate's bedroom to tell her what had happened. Roommate and Victim told Jok and Akok to leave the apartment, but the two men refused. Roommate then called the police.

¶8    When the police arrived at about 6:30 a.m., they encountered Jok outside the apartment. He was "stumbling," had a hard time walking a straight line, smelled of alcohol, and had bloodshot eyes. Police also found Akok inside the apartment lying near the entrance. Both Jok and Akok appeared to be intoxicated. When a detective attempted to interview the two men, she was unable to understand Jok because his speech was slurred; Akok was entirely unresponsive.

¶9    Some of the details Victim offered to the police—given by means of a statement to an officer and witness report during the immediate investigation—varied from the testimony she offered at trial, which is recounted above. *See supra* ¶¶ 3–7.[3] She told police that after Roommate had gone to bed at 1 a.m., she was lying on the couch when Akok began to make inappropriate sexual comments toward her and physically touch her. After going into the bathroom to clean up, she found Jok and Akok still seated in the living room area. Although she was upset about what had happened, she lay down on the couch and tried to go to sleep. She told police that Akok raped her and then Jok fondled her breasts and touched her vagina numerous times in an attempt to penetrate it with his finger. In her witness statement, Victim wrote that Akok had touched her before Jok.

¶10    After giving her statement, Victim went to the hospital for an examination by a sexual assault nurse examiner (Nurse).

---

3. When confronted with these discrepancies at trial, Victim testified that she "had it mixed up" with regard to certain details when she made the statements to the police.

Victim told Nurse that after Roommate went to bed, she fell asleep on the couch. She awoke to Akok kissing her on the mouth and touching her breasts. Akok then pulled down her pants and underwear and forced her to have sex. Victim said that Jok then pulled up her bra and touched her breasts. She also disclosed that Jok had touched her vagina and anus with his hand.[4] Nurse stated that she was "surprised at the amount of injury" (namely, redness, swelling, a one centimeter laceration) to Victim's genitalia and that the one centimeter bruise-like injury to Victim's hymen "is more consistent with digital penetration, a penetration by a finger. I don't often see injury to the hymen when there is not [a] report of digital penetration."

¶11 After the physical examination, a detective assigned to the case interviewed Victim. Victim told the detective that after the incident with Akok, she went to the bathroom, came back to the couch, slept for four hours, and awoke to Jok touching her.

¶12 Roommate also filled out a witness statement for police, maintaining that Jok and Akok were "drinking and hanging out" at the apartment when she went to bed at 1 a.m. Roommate stated that Victim came into her room at around 6 a.m. and told her that Akok had forced her to have sex, that Jok had touched her, and that "she told them to stop but they wouldn't."

¶13 A DNA analyst (Analyst) determined that a sample of sperm cells from a vaginal swab matched Akok's DNA. No other male's DNA was detected on the swabs. Analyst explained that "touch DNA" is more difficult to detect because vaginal fluid tends to slough off the small amount of genetic material deposited by mere touching.

---

4. Victim did not initially tell Nurse that Jok had touched her vagina. Victim shared this information in response to Nurse's questions.

*Procedural History*

¶14    The State charged Jok with two counts of forcible sexual abuse and Akok with rape, and the two men were tried together before a jury. The State's witnesses included Victim, several police officers, Nurse, and Analyst.[5] These witnesses testified that (1) Jok and Akok had come to the apartment for a visit, (2) Victim fell asleep on a couch in the living room, (3) Jok had touched Victim's breasts and digitally penetrated her vagina, (4) Akok raped Victim, (5) Victim informed Roommate of the sexual assault, and (6) Roommate called the police.

¶15    At the close of the State's case, Akok made a motion "for directed verdict of acquittal for the insufficiency of the evidence." Jok joined this motion and additionally asked for a judgment of acquittal "based on [Victim's] testimony that when she was touched by [Jok], she said no, [and] he stopped." The district court asked whether the basis of both motions was "the credibility of [Victim's] testimony." Jok's counsel responded, "Yes," but neither defendant presented any specific reason why Victim's testimony lacked credibility or suggested that Victim's testimony was so inherently improbable that the district court should disregard it. The State argued that Victim's credibility was "going to be an issue for the jurors to decide." The State also pointed out that Jok's "one free touch" theory had no legal basis. The district court denied the motions for directed verdict, stating,

> There has been sufficient evidence to support all of the charges as they are for a trier of fact to now at least address that. Specifically to the credibility, it will just go to weight[,] and . . . there is no legal

---

5. The State subpoenaed Roommate to appear at trial, but the process server was unable to locate her.

basis for just saying because the positions were changed and the different body parts were involved that it doesn't support two potential verdicts[,] one on each of the forcible sexual abuse.

¶16    The jury convicted Jok and Akok as charged. Jok and Akok appealed, asserting that prosecutorial misconduct occurred in closing argument. This court agreed and vacated the judgments of conviction. *State v. Jok*, 2015 UT App 90, ¶¶ 11, 15, 348 P.3d 385; *State v. Akok*, 2015 UT App 89, ¶¶ 14, 30, 348 P.3d 377.

¶17    On remand, Jok, represented by new counsel, agreed to a bench trial,[6] using the transcript of the first trial as evidence instead of presenting the evidence again.[7] The parties stipulated to the district court receiving Roommate's statement—that Victim went into Roommate's room and told her that "[Akok] forced her to have sex and that [Jok] was touching her and she told them to stop but they wouldn't"—because Roommate was unavailable to testify. Jok declined to testify, and the defense rested without presenting additional evidence. In closing, Jok's counsel attacked Victim's credibility, noting that Victim was intoxicated, that only Akok's DNA was found on the vaginal swabs, and that Victim's physical injuries were consistent with

---

6. On remand, the State amended the charges against Jok to two counts of sexual battery, each a class A misdemeanor. Jok had been in custody over three years at the time of his bench trial, exceeding the maximum sentence of one year each he faced on the amended charges, and would consequently not face additional time in custody if convicted on remand. This circumstance may explain why Jok agreed to a bench trial on remand.

7. On remand, Akok pled guilty to attempted rape.

digital penetration by Akok, and arguing that "the physical evidence contradict[ed] [Victim's] statements and . . . that her statements alone [were not] sufficient to prove the case beyond a reasonable doubt."

¶18    The district court stated that it had "considered all of the evidence as a whole and [found] that the physical circumstances, the medical testimony, [and] the DNA testimony combined to corroborate, to support what [Victim] said happened." The court convicted Jok on both counts of sexual battery, sentenced him to one year in jail on each, and closed the case with credit for time served. Jok appeals.

ISSUE AND STANDARD OF REVIEW

¶19    Jok contends that he was improperly convicted on insufficient evidence, arguing that Victim's allegations against him were inherently improbable. "We will reverse a guilty verdict for insufficient evidence only when the evidence is so inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crimes of which he was convicted." *State v. Carrell*, 2018 UT App 21, ¶ 21, 414 P.3d 1030.

ANALYSIS

¶20    The focus of this appeal is Jok's contention that the evidence was insufficient to convict him of sexual battery, because Victim's testimony "was too inherently improbable to support the verdict."[8] In *State v. Robbins*, our supreme court

---

8. We do not address whether, in a bench trial, the issue of inherent improbability needs to be specifically raised before the trial court in the first instance in order to preserve the issue for

(continued…)

articulated the "scope of the inherent improbability doctrine." 2009 UT 23, ¶ 13, 210 P.3d 288. A court can "reevaluate the jury's credibility determinations only in those instances where (1) there are material inconsistencies in the testimony and (2) there is no other circumstantial or direct evidence of the defendant's guilt. The existence of any additional evidence supporting the verdict prevents the judge from reconsidering the witness's credibility." *Id.* ¶ 19. In *State v. Prater*, our supreme court clarified *Robbins*'s two-prong formulation of the inherent-improbability doctrine by stating that it is "inconsistencies in the [witness's] testimony *plus* the patently false statements the [witness makes] *plus* the lack of any corroboration that [allows a] court to conclude that insufficient evidence [supports a defendant's] conviction." 2017 UT 13, ¶ 38, 392 P.3d 398. This "narrow" formulation of the doctrine found in *Robbins* and *Prater* presents "a significant barrier in succeeding on claims of inherent improbability." *State v. Cady*, 2018 UT App 8, ¶¶ 17–18, 414 P.3d 974. Thus, "[i]t is

---

(…continued)

appeal. We note that normally, after a bench trial, a party may question the sufficiency of the evidence on appeal regardless of any failure to raise that issue below. *See State v. Holland*, 2018 UT App 203, ¶ 9, 437 P.3d 501 ("Unlike challenges to a jury verdict, a defendant need not file a separate motion or make a separate objection to challenge the sufficiency of the evidence supporting the court's factual findings in a bench trial."); *see also* Utah R. Civ. P. 52(a)(3).

Likewise, we do not address the question of whether the inherent-improbability doctrine applies at all to bench trial verdicts, where the trial court has presumably not only determined that sufficient evidence existed but that this evidence met the burden of proof beyond a reasonable doubt. *See State v. Robbins*, 2009 UT 23, ¶ 19, 210 P.3d 288 (stating that a court can "reevaluate *the jury's* credibility determinations" in limited circumstances (emphasis added)).

difficult to successfully establish such a claim on appeal." *Id.*
¶ 18; *see also State v. Doyle*, 2018 UT App 239, ¶ 17, 437 P.3d 1266
(stating that "the inherent improbability doctrine has very
limited applicability and comes into play only in those
instances" that satisfy the approach adopted in *Robbins* and
*Prater* (cleaned up)); *State v. Ray*, 2017 UT App 78, ¶ 25, 397 P.3d
817 ("'Inherent improbability' is a distinction reserved for . . .
comparatively rare instances; it does not apply more generally to
cases involving a victim's incredibility—not even significant
incredibility."), *cert. granted on other grounds*, 406 P.3d 250 (Utah
2017); *State v. Black*, 2015 UT App 30, ¶ 20, 344 P.3d 644 (stating
that inherent improbability applies in "certain limited
circumstances").

¶21   Jok argues that Victim's testimony was inherently
improbable under the *Robbins/Prater* test. Specifically, he argues
that Victim's testimony did not support the verdict, because
"(1) it was materially inconsistent; (2) it contained patently false
statements; and (3) there was no other circumstantial or direct
evidence that supported Jok's guilt." We disagree with Jok on
each point.

I. The Absence of Material Inconsistencies in Victim's Testimony

¶22   Victim's testimony is not materially inconsistent. "The
mere fact that [Victim's] account changes between her initial
interview with police and her testimony at trial is by itself
insufficient" to establish material inconsistency. *See State v.
Carrell*, 2018 UT App 21, ¶ 53, 414 P.3d 1030. To satisfy the
material inconsistency element of the *Robbins/Prater* test, Victim's
"testimony at trial must be internally inconsistent; the fact that
[Victim's] trial testimony is somewhat at odds with other
evidence in the case, including perhaps [Victim's] own prior
statement, is not enough to render that testimony inherently
improbable." *See id.* (cleaned up); *State v. Prater*, 2017 UT 13,
¶ 39, 392 P.3d 398 ("The three witnesses' pre-trial inconsistent

statements do not render their testimony apparently false. The question of which version of their stories was more credible is the type of question we routinely require juries to answer." (cleaned up)); *State v. Torres*, 2018 UT App 113, ¶ 22, 427 P.3d 550 ("A [factfinder] could have reasonably concluded that the differences between the victim's prior statements and her testimony at trial were due to the victim previously providing incomplete statements, the officer misreporting her statement, or a simple misunderstanding."). Differences expressed in testimony concerning details, such as the relative location of individuals, do not in this context rise to the level of materiality. Furthermore, "inconsistencies with respect to peripheral issues or details of the abuse will generally not implicate the inherent-improbability doctrine but are matters for the [factfinder] to resolve in assessing the witness's credibility." *State v. Kamrowski*, 2015 UT App 75, ¶ 16, 347 P.3d 861; *see also State v. Fletcher*, 2015 UT App 167, ¶ 9, 353 P.3d 1273 (stating that "mere[] details supporting" a "primary assertion" are not material "but instead are within the range of normal, but flawed, human recollection—something that juries are capable of sorting through").

¶23 Jok contends that Victim's statements to investigating police officers were materially inconsistent with the testimony she offered at trial. Specifically, Jok contends that Victim's statements and testimony were inconsistent regarding when Jok and Akok touched her, who touched her first, and where Jok and Akok were sitting when the touching occurred. Jok also contends that Victim was inconsistent about knowing the color of Akok's car, whether she kept her pillows on the couch during the day, how much alcohol she drank, and the number of minutes she remained on the floor of Roommate's bedroom before she told her of the rape and sexual battery. But as we articulated in *Carrell*, to be materially inconsistent, Victim's "testimony at *trial* must be internally inconsistent." 2018 UT App 21, ¶ 53 (emphasis added). The mere fact that Victim's trial testimony varies to some degree with statements she made to

investigating officers shortly after the abuse occurred "is not enough to render that testimony inherently improbable." *Id.* (cleaned up). In sum, the details of Victim's statements that Jok cites as evidence of inconsistency are merely "peripheral issues or details," *see Kamrowski*, 2015 UT App 75, ¶ 16, that do not cast doubt on Victim's central allegation that Jok committed sexual battery by touching her without her consent.

## II. The Lack of Patently False Statements in Victim's Testimony

¶24 There is no indication of patent falsity in Victim's testimony. Jok contends that Victim's statement that she returned to the couch to sleep after being raped by Akok was "patently false" because a person "who ha[d] just been raped would [not] go back to the same couch in the same room as the rapist and his friend and sleep for four hours." Jok's assertion about Victim's behavior is not well taken. We note that Victim did not so testify at trial,[9] but even if she had, characterizing such a statement as "patently false" reflects an unfounded stereotype about the behavior of rape victims. As the State points out, Jok's argument ignores the reality that rape victims display a diverse range of reactions to the harm they suffered. *See, e.g., Doe v. Westmont College*, 246 Cal. Rptr. 3d 369, 377 (Ct. App. 2019) ("Victims often feel shame after [a sexual] assault, and may even take responsibility for it."); *State v. Sullivan*, 712 A.2d 919, 922 n.5 (Conn. 1998) ("[T]he assumption that it is 'natural' for victims to report that they have been sexually assaulted has been largely discredited by modern research indicating that victims may not tell others about a sexual assault owing to feelings of shame or

---

9. Victim did not testify at trial that she returned to the couch to sleep after being raped. Rather, this detail was gleaned from her statement to a police officer investigating the crime shortly after it was reported. At trial, Victim stated that she woke to Jok touching her, after which Akok raped her.

fear of public embarrassment."); *People v. Bowen*, 609 N.E.2d 346, 357 (Ill. App. Ct. 1993) ("A delay in reporting incidents of sexual assault may be reasonable where the victim's silence is attributed to fear, shame, guilt and embarrassment."); *State v. Obeta*, 796 N.W.2d 282, 294 (Minn. 2011) (noting that "most states now allow some form of expert testimony that describes typical counterintuitive behaviors exhibited by adult victims of sexual assaults"). Thus, even if Victim did return to the couch after being raped by Akok, such behavior in no way suggests that her testimony is "patently false." Rather, it can be explained by any number of possible human reactions to having just been raped, including shame, shock, resignation, humiliation, fear, embarrassment, confusion, and/or disbelief.[10]

---

10. At oral argument and in his reply brief, Jok contends that Victim's testimony that during the rape Akok held her wrists down with both hands while simultaneously pulling down her pants with another hand rendered her testimony internally inconsistent and patently false because such a description required Akok to have three hands. We are not persuaded, because this alleged inconsistency has a reasonable explanation. Akok could have begun by using both hands to pin Victim's wrists, then once he overpowered her, he could have continued to hold her wrists with one hand while using the other to pull down her pants, or he could have temporarily let go of one wrist while he pulled her pants down. Victim may have simply been struggling to explain the circumstances of the rape. *See State v. Ruiz*, 2012 UT App 42, ¶ 4, 272 P.3d 185 ("The [factfinder] may well have concluded that the inconsistencies in the victim's testimony were not a product of fabrication but rather of her language limitations and cognitive impairment."). The actual question to which Victim answered, "Yes," was whether the rapist, "in some fashion while still holding [her] down," was able to move her legs and pull her pants down. We do not read

(continued…)

### III. Other Corroborating Evidence

¶25 Additional evidence corroborates Victim's testimony. Jok contends that the State presented no "other evidence to corroborate [Victim's] allegation specific to Jok." But contrary to Jok's argument, our inherent-improbability case law does not require evidence corroborating the specific-offense conduct or elements of the offense. As our supreme court noted in *State v. Robbins*, the "existence of any additional evidence supporting the verdict prevents the judge from reconsidering the witness's credibility" under the inherent-improbability doctrine. 2009 UT 23, ¶ 19, 210 P.3d 288; *see also State v. Crespo*, 2017 UT App 219, ¶ 27, 409 P.3d 99 (stating that under the "inherent improbability standard," the credibility of a witness's testimony may be reassessed only when such testimony "is the sole evidence that a crime was even committed and there is a complete lack of circumstantial evidence" (cleaned up)). Thus, for Jok to succeed on this element of inherent improbability, he must show that there was a complete lack of any additional circumstantial evidence supporting the verdict. He has failed to do so.

¶26 As the district court found, additional evidence corroborated Victim's testimony about the sexual assault she suffered at the hands of Jok. The district court expressly stated that it had "considered all of the evidence as a whole and [found] that the physical circumstances, the medical testimony, [and] the DNA testimony combined to corroborate, to support what [Victim] said happened."

¶27 Undisputed evidence regarding the physical circumstances supports Victim's account. Jok and Akok were at

---

(…continued)
this testimony as being possible only if the rapist had three arms, and we do not consider this testimony to be demonstrably false.

Victim's apartment. They were drinking and stayed there after Roommate went to bed. At some point, Victim reported to Roommate that Jok had sexually assaulted her and that Akok had raped her. Victim reported the essential elements of these events to police investigators and Nurse the next morning. While it is true that Victim's account varied somewhat with regard to timing and the location of Jok and Akok, she was consistent with regard to the material facts of her assertion—that Jok touched her and Akok raped her. *See State v. Fletcher*, 2015 UT App 167, ¶ 9, 353 P.3d 1273; *supra* ¶ 22.

¶28 The medical testimony also supports Victim's account. Victim testified that she felt a "sharp pain" when Jok penetrated her vagina with his finger. Nurse observed an injury to Victim's vagina, specifically an identifiable one-centimeter laceration and a one-centimeter bruise to the hymen that were more consistent with digital penetration than with penile penetration. In fact, Nurse testified that, while the injury could have been caused by nonconsensual penile penetration, in her experience of examining sexual assault victims, she has seen similar injury to the hymen only when there has been a complaint of digital penetration. Indeed, when specifically asked whether it was "possible that an injury to the hymen could be caused by penile penetration," Nurse answered, "It's possible but not probable."

¶29 Finally, DNA evidence corroborates Victim's testimony, albeit in an indirect manner. Put simply, Victim testified that (1) she was alone in the living room with Akok and Jok and (2) one man raped her and the other man touched her breasts and digitally penetrated her without consent. The DNA evidence conclusively established that Akok was the man who raped Victim. That fact leaves Jok as the other man who committed sexual battery. Certainly, the DNA evidence rebuts any assertion that the claim of sexual activity was completely fabricated.

¶30    Thus we conclude that Victim's testimony was not inherently improbable under the test articulated by our supreme court in *Robbins*, 2009 UT 23, and *State v. Prater*, 2017 UT 13, 392 P.3d 398. We view Jok's attack on Victim's credibility "to be a garden-variety claim of insufficient evidence that he unsuccessfully tries to fit into the inherent-improbability box." *See State v. Cady*, 2018 UT App 8, ¶ 22, 414 P.3d 974. And when the evidence is disputed as it was in this case, it is not for the court to resolve the conflict by declaring testimony inherently improbable; rather, the factfinder "serves as the exclusive judge of both the credibility of witnesses and the weight to be given to particular evidence." *State v. Black*, 2015 UT App 30, ¶ 19, 344 P.3d 644 (cleaned up).

## CONCLUSION

¶31    Jok's assertion that he was convicted on insufficient evidence because Victim's testimony was inherently improbable fails. We conclude that Victim's testimony was not materially inconsistent, patently false, or uncorroborated by other evidence.

¶32    Affirmed.

_____